## HAWAIIAN AIRLINES, INC. *v.* NORRIS

No. 92–2058.   Argued April 28, 1994—Decided June 20, 1994*

*Together with *Finazzo et al.* v. *Norris,* also on certiorari to the same court (see this Court's Rule 12.2).

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Kenneth B. Hipp* argued the cause for petitioners. With him on the briefs were *David J. Dezzani* and *Margaret C. Jenkins.*

*Susan Oki Mollway* argued the cause for respondent. With her on the brief were *Edward DeLappe Boyle, Marsha S. Berzon, Mark Schneider,* and *Laurence Gold.*

*Richard H. Seamon* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, John F. Manning,* and *William Kanter.*†

---

†Briefs of *amici curiae* urging reversal were filed for the State of New Jersey by *Deborah T. Poritz,* Attorney General, *Andrea M. Silkowitz,* Assistant Attorney General, and *Eldad Philip Isaac,* Deputy Attorney General; for the Air Transport Association of America by *Charles A. Shanor, John J. Gallagher,* and *Margaret H. Spurlin;* and for the National Railway Labor Conference by *Ralph J. Moore, Jr., I. Michael Greenberger,* and *David P. Lee.*

Briefs of *amici curiae* urging affirmance were filed for the State of Hawaii et al. by *Robert A. Marks,* Attorney General of Hawaii, and *Steven*

JUSTICE BLACKMUN delivered the opinion of the Court.

This action involves the scope of federal pre-emption under the Railway Labor Act (RLA), 45 U. S. C. § 151 *et seq.* The RLA, which was extended in 1936 to cover the airline industry, see Act of Apr. 10, 1936, ch. 166, 49 Stat. 1189; 45 U. S. C. §§ 181–188, sets up a mandatory arbitral mechanism to handle disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," 45 U. S. C. § 153 First (i). The question in this case is whether an aircraft mechanic who claims that he was discharged for refusing to certify the safety of a plane that he considered unsafe and for reporting his safety concerns to the Federal Aviation Administration may pursue available state-law remedies for wrongful discharge, or whether he may seek redress only through the RLA's arbitral mechanism. We hold that the RLA does not pre-empt his state-law causes of action.

## I

' Respondent Grant Norris is an aircraft mechanic licensed by the Federal Aviation Administration (FAA). His aircraft mechanic's license authorizes him to approve an airplane and

---

*S. Michaels,* Deputy Attorney General, *Grant Woods,* Attorney General of Arizona, *Richard Blumenthal,* Attorney General of Connecticut, *Robert A. Butterworth,* Attorney General of Florida, *Roland W. Burris,* Attorney General of Illinois, *Pamela Fanning Carter,* Attorney General of Indiana, *Robert T. Stephan,* Attorney General of Kansas, *Michael E. Carpenter,* Attorney General of Maine, *Frank J. Kelley,* Attorney General of Michigan, *Jeremiah W. (Jay) Nixon,* Attorney General of Missouri, *Joseph P. Mazurek,* Attorney General of Montana, *Tom Udall,* Attorney General of New Mexico, *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *Darrell V. McGraw, Jr.,* Attorney General of West Virginia, and *Richard Weil,* Acting Attorney General of the Northern Mariana Islands; for the Allied Educational Foundation by *Bertram R. Gelfand* and *Jeffrey C. Dannenberg;* for the National Employment Lawyers Association by *Mary Ann B. Oakley, Janette Johnson,* and *Robert B. Fitzpatrick;* and for the Railway Labor Executives' Association by *John O'B. Clarke, Jr.*

return it to service after he has made, supervised, or inspected certain repairs performed on that plane. See Certification: Airmen Other Than Flight Crewmembers, 14 CFR §§ 65.85 and 65.87 (1987). If he were to approve any aircraft on which the repairs did not conform to FAA safety regulations, the FAA could suspend or revoke his license. See Maintenance, Preventive Maintenance, Rebuilding and Alteration, 14 CFR § 43.12 (1992).

On February 2, 1987, respondent was hired by petitioner Hawaiian Airlines, Inc. (HAL). Many of the terms of his employment were governed by a collective-bargaining agreement (CBA) negotiated between the carrier and the International Association of Machinists and Aerospace Workers. Under the CBA, respondent's duties included inspecting and repairing all parts of a plane and its engine. On July 15, 1987, during a routine preflight inspection of a DC–9 plane, he noticed that one of the tires was worn. When he removed the wheel, respondent discovered that the axle sleeve, which should have been mirror smooth, was scarred and grooved. This damaged sleeve could cause the landing gear to fail. Respondent recommended that the sleeve be replaced, but his supervisor ordered that it be sanded and returned to the plane. This was done, and the plane flew as scheduled. At the end of the shift, respondent refused to sign the maintenance record to certify that the repair had been performed satisfactorily and that the airplane was fit to fly. See 14 CFR § 43.9(a) (1992). The supervisor immediately suspended him pending a termination hearing. Respondent immediately went home and called the FAA to report the problem with the sleeve.[1]

Respondent then invoked the grievance procedure outlined in the CBA, and a "Step 1" grievance hearing was held

---

[1] In response, the FAA initiated a comprehensive investigation, proposed a civil penalty of $964,000 against HAL, proposed the revocation of the license of the supervisor who terminated respondent, and ultimately settled all charges for a substantial fine.

on July 31, 1987. Petitioner HAL accused respondent of insubordination, claiming that his refusal to sign the record violated the CBA's provision that an aircraft mechanic "may be required to sign work records in connection with the work he performs." Respondent relied on the CBA's guarantees that an employee may not be discharged without just cause and may not be disciplined for refusing to perform work that is in violation of health or safety laws. The hearing officer terminated respondent for insubordination.

Still conforming to the CBA procedures, respondent appealed his termination, seeking a "Step 3" grievance hearing. Before this hearing took place, HAL offered to reduce respondent's punishment to suspension without pay, but warned him that "any further instance of failure to perform [his] duties in a responsible manner" could result in discharge. Respondent did not respond to this offer, nor, apparently, did he take further steps to pursue his grievance through the CBA procedures.

On December 18, 1987, respondent filed suit against HAL in Hawaii Circuit Court. His complaint included two wrongful-discharge torts—discharge in violation of the public policy expressed in the Federal Aviation Act of 1958 and implementing regulations, and discharge in violation of Hawaii's Whistleblower Protection Act, Haw. Rev. Stat. §§ 378–61 to 378–69 (1988).[2] He also alleged that HAL had breached the CBA. HAL removed the action to the United States District Court for the District of Hawaii, which dismissed the breach-of-contract claim as pre-empted by the

---

[2] The Hawaii Whistleblower Protection Act forbids an employer to "discharge, threaten, or otherwise discriminate against an employee . . . because . . . [t]he employee . . . reports or is about to report to a public body . . . a violation or a suspected violation of a law or rule adopted pursuant to law of this State, a political subdivision of this State, or the United States, unless the employee knows that the report is false." § 378–62(1). The Act authorizes an employee to file a civil action seeking injunctive relief and actual damages. § 378–63(a).

RLA, and remanded the other claims to the state trial court. The trial court then dismissed respondent's claim of discharge in violation of public policy, holding that it, too, was pre-empted by the RLA's provision of exclusive arbitral procedures. The state court certified its order as final to permit respondent to take an immediate appeal.

In the meantime, respondent had filed a second lawsuit in state court, naming as defendants three of HAL's officers who allegedly directed, confirmed, or ratified the claimed retaliatory discharge.[3] He again sought relief for, among other things, discharge in violation of public policy and of the Hawaii Whistleblower Protection Act. The Hawaii trial court dismissed these two counts as pre-empted by the RLA and certified the case for immediate appeal.

The Supreme Court of Hawaii reversed in both cases, concluding that the RLA did not pre-empt respondent's state tort actions. *Norris* v. *Hawaiian Airlines, Inc.*, 74 Haw. 235, 842 P. 2d 634 (1992); 74 Haw. 648, 847 P. 2d 263 (1993). That court concluded that the plain language of § 153 First (i) does not support pre-emption of disputes independent of a labor agreement, 74 Haw., at 251, 842 P. 2d, at 642, and interpreted the opinion in *Consolidated Rail Corporation* v. *Railway Labor Executives' Assn.*, 491 U. S. 299 (1989) *(Conrail)*, to limit RLA pre-emption to "disputes involving contractually defined rights." 74 Haw., at 250, 842 P. 2d, at 642. The court rejected petitioners' argument that the retaliatory discharge claims were pre-empted because determining whether HAL discharged respondent for insubordination, and thus for just cause, required construing the CBA. The court pointed to *Lingle* v. *Norge Div. of Magic Chef, Inc.*, 486 U. S. 399 (1988), a case involving § 301 of the Labor-Management Relations Act, 1947 (LMRA), 29 U. S. C. § 185, in which the Court held that a claim of wrongful termination in retaliation for filing a state worker's compensation claim

---

[3] These managerial officers, petitioners here, are Paul J. Finazzo, Howard E. Ogden, and Hatsuo Honma.

did not require interpretation of a CBA, but depended upon purely factual questions concerning the employee's conduct and the employer's motive. Because the same was true in this action, said the Supreme Court of Hawaii, respondent's state tort claims were not pre-empted.

We granted certiorari in these consolidated cases, 510 U. S. 1083 (1994).

## II

## A

Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent. See *Allis-Chalmers Corp.* v. *Lueck*, 471 U. S. 202, 208 (1985). Pre-emption of employment standards "within the traditional police power of the State" "should not be lightly inferred." *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1, 21 (1987); see also *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 715 (1985) (a federal statute will be read to supersede a State's historic powers only if this is "'the clear and manifest purpose of Congress'").

Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes. *Atchison, T. & S. F. R. Co.* v. *Buell*, 480 U. S. 557, 562 (1987); see also 45 U. S. C. § 151a. To realize this goal, the RLA establishes a mandatory arbitral mechanism for "the prompt and orderly settlement" of two classes of disputes. 45 U. S. C. § 151a. The first class, those concerning "rates of pay, rules or working conditions," *ibid.*, are deemed "major" disputes. Major disputes relate to "'the formation of collective [bargaining] agreements or efforts to secure them.'" *Conrail*, 491 U. S., at 302, quoting *Elgin, J. & E. R. Co.* v. *Burley*, 325 U. S. 711, 723 (1945). The second class of disputes, known as "minor" disputes, "gro[w] out of grievances or out of the interpretation or application of agreements covering rates

of pay, rules, or working conditions." 45 U. S. C. § 151a. Minor disputes involve "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Trainmen* v. *Chicago R. & I. R. Co.*, 353 U. S. 30, 33 (1957). Thus, "major disputes seek to create contractual rights, minor disputes to enforce them." *Conrail*, 491 U. S., at 302, citing *Burley*, 325 U. S., at 723.

Petitioners contend that the conflict over respondent's firing is a minor dispute. If so, it must be resolved only through the RLA mechanisms, including the carrier's internal dispute-resolution processes and an adjustment board established by the employer and the unions. See 45 U. S. C. § 184; *Buell*, 480 U. S., at 563; *Conrail*, 491 U. S., at 302. Thus, a determination that respondent's complaints constitute a minor dispute would pre-empt his state-law actions.

## B

The Court's inquiry into the scope of minor disputes begins, of course, with the text of the statute. Petitioners point out that the statute defines minor disputes to include "disputes . . . growing out of grievances, *or* out of the interpretation or application of [CBA's]." Petitioners argue that this disjunctive language must indicate that "grievances" means something other than labor-contract disputes, else the term "grievances" would be superfluous. Accordingly, petitioners suggest that "grievances" should be read to mean all employment-related disputes, including those based on statutory or common law. Even if we were persuaded that the word "or" carried this weight, but cf. *United States* v. *Olano*, 507 U. S. 725, 732 (1993) (reading "error or defect" to create one category of "error"), citing *United States* v. *Young*, 470 U. S. 1, 15, n. 12 (1985); *McNally* v. *United States*, 483 U. S. 350, 358–359 (1987) (second phrase in disjunctive added simply to make the meaning of the first phrase "unmistakable"), petitioners' interpretation produces an overlap not unlike the one it purports to avoid. Their

expansive definition of "grievances" necessarily encompasses disputes growing out of "the interpretation or application" of CBA's. Thus, in attempting to save the term "grievances" from superfluity, petitioners would make the phrase after the "or" mere surplusage.

We think it more likely that "grievances," like disputes over "the interpretation or application" of CBA's, refers to disagreements over how to give effect to the bargained-for agreement. The use of "grievance" to refer to a claim arising out of a CBA is common in the labor-law context in general, see, *e. g., Paperworkers* v. *Misco, Inc.*, 484 U. S. 29, 36 (1987), and it has been understood in this way in the RLA context. See H. R. Rep. No. 1944, 73d Cong., 2d Sess., 2–3 (1934) (referring to RLA settlement of "minor disputes known as 'grievances,' which develop from the interpretation and/or application of the contracts between the labor unions and the carriers"). Significantly, the adjustment boards charged with administration of the minor-dispute provisions have understood these provisions as pertaining only to disputes invoking contract-based rights. See, *e. g.*, NRAB Fourth Div. Award No. 4548 (1987) (function of the National Rail Adjustment Board (Board) is to decide disputes in accordance with the controlling CBA); NRAB Third Div. Award No. 24348 (1983) (issues not related to the interpretation or application of contracts are outside the Board's authority); NRAB Third Div. Award No. 19790 (1973) ("[T]his Board lacks jurisdiction to enforce rights created by State or Federal Statutes and is limited to questions arising out of interpretations and application of Railway Labor Agreements"); *Northwest Airlines/Airline Pilots Assn., Int'l System Bd. of Adjustment*, Decision of June 28, 1972, p. 13 ("[B]oth the traditional role of the arbitrator and admonitions of the courts require the Board to refrain from attempting to construe any of the provisions of the [RLA]"); *United Airlines, Inc.*, 48 LA 727, 733 (BNA) (1967) ("The

jurisdiction of this System Board does not extend to interpreting and applying the Civil Rights Act").

Accordingly, we believe that the most natural reading of the term "grievances" in this context is as a synonym for disputes involving the application or interpretation of a CBA. See Webster's Third New International Dictionary 1585 (1986) (the word "or" may be used to indicate "the synonymous, equivalent, or substitutive character of two words or phrases"). Nothing in the legislative history of the RLA[4] or other sections of the statute[5] undermines this conclusion. But even accepting that § 151a is susceptible of more than one interpretation, no proposed interpretation demonstrates a clear and manifest congressional purpose to create a regime

---

[4] During the debates surrounding the RLA's enactment in 1926, floor statements that, in isolation, could support a broader interpretation of "grievances" were counterbalanced by other statements—some even by the same legislators—that equated grievances with contract interpretation. Compare 67 Cong. Rec. 4517, 8807 (1926), with id., at 4510, 8808. This inconclusive debate hardly calls for fashioning a broad rule of preemption. Moreover, in 1934 when Congress amended the RLA to make arbitration mandatory for minor disputes, the accompanying House Report stated that the bill was intended "to provide sufficient and effective means for the settlement of minor disputes known as 'grievances,' which develop from the interpretation and/or application of the contracts between the labor unions and the carriers, fixing wages and working conditions." H. R. Rep. No. 1944, 73d Cong., 2d Sess., 2–3 (1934).

[5] Petitioners cite the statute's reference to the parties' general duties as including "settl[ing] all disputes, whether arising out of the application of [collective bargaining] agreements or otherwise." 45 U. S. C. § 152 First. This provision, which is phrased more broadly than the operative language of § 153 First (i), does not clearly refer only to minor disputes. But even if this provision is read to require parties to try to settle certain issues arising out of the employment relationship but not specifically addressed by the CBA, this does not compel the conclusion that all issues touching on the employment relationship must be resolved through arbitration or that all claims involving rights and duties that exist independent of the CBA are thereby pre-empted. Our precedents squarely reject this pervasive pre-emption.

that broadly pre-empts substantive protections extended by the States, independent of any negotiated labor agreement.

## C

Our case law confirms that the category of minor disputes contemplated by § 151a are those that are grounded in the CBA. We have defined minor disputes as those involving the interpretation or application of existing labor agreements. See, *e. g., Conrail,* 491 U. S., at 305 ("The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing [CBA]"); *Pittsburgh & Lake Erie R. Co. v. Railway Labor Executives' Assn.,* 491 U. S. 490, 496, n. 4 (1989) ("Minor disputes are those involving the interpretation or application of existing contracts"); *Trainmen,* 353 U. S., at 33 (minor disputes are "controversies over the meaning of an existing collective bargaining agreement"); *Slocum v. Delaware, L. & W. R. Co.,* 339 U. S. 239, 243 (1950) (RLA arbitral mechanism is meant to provide remedies for "adjustment of railroad-employee disputes growing out of the interpretation of existing agreements").

Moreover, we have held that the RLA's mechanism for resolving minor disputes does not pre-empt causes of action to enforce rights that are independent of the CBA. More than 60 years ago, the Court rejected a railroad's argument that the existence of the RLA arbitration scheme pre-empted a state statute regulating the number of workers required to operate certain equipment. *Missouri Pacific R. Co. v. Norwood,* 283 U. S. 249, 258 (1931) ("No analysis or discussion of the provisions of the Railway Labor Act of 1926 is necessary to show that it does not conflict with the Arkansas statutes under consideration"). Not long thereafter, the Court rejected a claim that the RLA pre-empted an order by the Illinois Commerce Commission requiring cabooses on all trains; the operative CBA required cabooses only on some of the trains. *Terminal Railroad Assn. of St. Louis v. Train-*

*men*, 318 U. S. 1 (1943). Although the Court assumed that a railroad adjustment board would have jurisdiction under the RLA over this dispute, *id.*, at 6, it concluded that the state law was enforceable nonetheless:

> "State laws have long regulated a great variety of conditions in transportation and industry, such as sanitary facilities and conditions, safety devices and protections, purity of water supply, fire protection, and innumerable others. Any of these matters might, we suppose, be the subject of a demand by work[ers] for better protection and upon refusal might be the subject of a labor dispute which would have such effect on interstate commerce that federal agencies might be invoked to deal with some phase of it. . . . But it cannot be said that the minimum requirements laid down by state authority are all set aside. We hold that the enactment by Congress of the [RLA] was not a preemption of the field of regulating working conditions themselves . . . ." *Id.*, at 6–7.

Thus, under *Norwood*, substantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA.

Although *Norwood* and *Terminal Railroad* involved state workplace safety laws, the Court has taken a consistent approach in the context of state actions for wrongful discharge. In *Andrews* v. *Louisville & Nashville R. Co.*, 406 U. S. 320 (1972), the Court held that a state-law claim of wrongful termination was pre-empted, *not* because the RLA broadly pre-empts state-law claims based on discharge or discipline, but because the employee's claim was firmly rooted in a breach of the CBA itself. He asserted no right independent of that agreement:

> "Here it is conceded by all that the *only source* of [Andrews'] right not to be discharged, and therefore to treat an alleged discharge as a 'wrongful' one that entitles him

to damages, is the [CBA]. . . . [T]he disagreement turns on the extent of [the railroad's] obligation to restore [Andrews] to his regular duties following injury in an automobile accident. The existence and extent of such an obligation in a case such as this will depend on the interpretation of the [CBA]. Thus [Andrews'] claim, and [the railroad's] disallowance of it, stem from differing interpretations of the [CBA]. . . . His claim is therefore subject to the Act's requirement that it be submitted to the Board for adjustment." *Id.*, at 324 (emphasis added).

Here, in contrast, the CBA is not the "only source" of respondent's right not to be discharged wrongfully. In fact, the "only source" of the right respondent asserts in this action is state tort law. Wholly apart from any provision of the CBA, petitioners had a state-law obligation not to fire respondent in violation of public policy or in retaliation for whistle-blowing. The parties' obligation under the RLA to arbitrate disputes arising out of the application or interpretation of the CBA did not relieve petitioners of this duty.

*Atchison, T. & S. F. R. Co.* v. *Buell,* 480 U. S. 557 (1987), confirms that "minor disputes" subject to RLA arbitration are those that involve duties and rights created or defined by the CBA. In *Buell,* a railroad employee sought damages for workplace injuries under the Federal Employers' Liability Act (FELA), 45 U. S. C. §51 *et seq.,* which provides a remedy for a railroad worker injured through an employer's or co-worker's negligence. The railroad argued that, because the alleged injury resulted from conduct that was subject to the CBA, the employee's sole remedy was through RLA arbitration. The Court unanimously rejected this argument, emphasizing that the rights derived from the FELA were independent of the CBA:

"The fact that an injury otherwise compensable under the FELA was caused by conduct that may have been

subject to arbitration under the RLA does not deprive an employee of his opportunity to bring an FELA action for damages. . . . The FELA not only provides railroad workers with substantive protection against negligent conduct that is independent of the employer's obligations under its collective-bargaining agreement, but also affords injured workers a remedy suited to their needs, unlike the limited relief that seems to be available through the Adjustment Board. It is inconceivable that Congress intended that a worker who suffered a disabling injury would be denied recovery under the FELA simply because he might also be able to process a narrow labor grievance under the RLA to a successful conclusion." 480 U. S., at 564–565.

It likened *Buell* to other cases in which the Court had concluded that "notwithstanding the strong policies encouraging arbitration, 'different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers,'" *id.*, at 565, quoting *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728, 737 (1981), and distinguished it from *Andrews*, which involved a state wrongful-discharge claim "based squarely" on an alleged breach of a CBA, 480 U. S., at 566.[6]

---

[6] *Buell*, of course, involved possible RLA preclusion of a cause of action arising out of a *federal* statute, while this case involves RLA pre-emption of a cause of action arising out of *state* law and existing entirely independent of the CBA. That distinction does not rob *Buell* of its force in this context. See *Lingle* v. *Norge Div. of Magic Chef, Inc.*, 486 U. S. 399, 412 (1988) (*Buell* principles applicable to determine whether federal labor law pre-empts a state statute). Principles of federalism demand no less caution in finding that a federal statute pre-empts state law. See *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1, 21 (1987) (pre-emption of state statute "should not be lightly inferred in this [labor] area, since the establishment of labor standards falls within the traditional police power of the State").

### D

The pre-emption standard that emerges from the line of cases leading to *Buell*—that a state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA—is virtually identical to the pre-emption standard the Court employs in cases involving § 301 of the LMRA, 29 U. S. C. § 185.[7]  In *Allis-Chalmers Corp.* v. *Lueck,* 471 U. S. 202 (1985), the Court applied § 301 pre-emption to a state-law claim for bad-faith handling of a worker's compensation claim because the duties the employer owed the employee, including the duty of good faith, were rooted firmly in the CBA.   Its pre-emption finding was based on the fact that "the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, [so that] any attempt to assess liability here inevitably will involve contract interpretation." *Id.,* at 218.

It cautioned, however, that other state-law rights, those that existed independent of the contract, would not be similarly pre-empted:

> "Of course, not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law. . . . Nor is there any suggestion that Congress, in adopting § 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation. . . . Clearly, § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law.   In extending the pre-emptive effect of § 301 beyond suits for breach

---

[7] Section 301(a) provides federal-court jurisdiction over controversies involving CBA's and "authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." *Textile Workers* v. *Lincoln Mills of Ala.,* 353 U. S. 448, 451 (1957).

of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Id.*, at 211–212.[8]

In a case remarkably similar to the case before us now, this Court made clear that the existence of a potential CBA-based remedy did not deprive an employee of independent remedies available under state law. In *Lingle* v. *Norge Div. of Magic Chef, Inc.*, 486 U. S. 399 (1988), an employee covered by a labor agreement was fired for filing an allegedly false worker's compensation claim. After filing a grievance pursuant to her CBA, which protected employees against discharge except for "proper" or "just" cause, she filed a complaint in state court, alleging that she had been discharged for exercising her rights under Illinois worker's compensation laws. The state court had held her state-law claim pre-empted because "the same analysis of the facts" was required in both the grievance proceeding and the state-court action. This Court reversed.

It recognized that where the resolution of a state-law claim depends on an interpretation of the CBA, the claim is pre-empted. *Id.*, at 405–406, citing *Lueck, supra; Teamsters* v. *Lucas Flour Co.*, 369 U. S. 95 (1962). It observed, however, that "purely factual questions" about an employee's conduct or an employer's conduct and motives do not "requir[e] a court to interpret any term of a collective-bargaining agreement."

---

[8] The Court applies these principles in *Livadas* v. *Bradshaw*, in which we reject the claim that an employee's state-law right to receive a penalty payment from her employer was pre-empted under § 301 because the penalty was pegged to her wages, which were determined by the governing CBA. The Court states that "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Ante*, at 124, citing *Lingle* v. *Norge Div. of Magic Chef, Inc.*, 486 U. S., at 413, n. 12. In addition, it reaffirms that "§ 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law." *Ante*, at 123.

486 U. S., at 407. The state-law retaliatory discharge claim turned on just this sort of purely factual question: whether the employee was discharged or threatened with discharge, and, if so, whether the employer's motive in discharging her was to deter or interfere with her exercise of rights under Illinois worker's compensation law.

While recognizing that "the state-law analysis might well involve attention to the same factual considerations as the contractual determination of whether Lingle was fired for just cause," *id.*, at 408, the Court disagreed that

"such parallelism render[ed] the state-law analysis dependent upon the contractual analysis. For while there may be instances in which the National Labor Relations Act pre-empts state law on the basis of the subject matter of the law in question, § 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements. In other words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Id.*, at 408–410.

The Court's ruling in *Lingle* that the LMRA pre-empts state law only if a state-law claim is dependent on the interpretation of a CBA is fully consistent with the holding in *Buell*, 480 U. S., at 564–565, that the RLA does not pre-empt "substantive protection . . . independent of the [CBA]," with the holding in *Terminal Railroad*, 318 U. S., at 7, that the RLA does not pre-empt basic "protection . . . laid down by state authority," with the conclusion in *Andrews*, 406 U. S.,

at 324, that a state-law claim is pre-empted where it "depend[s] on the interpretation" of the CBA, and with the description in *Conrail*, 491 U. S., at 305, of a minor dispute as one that can be "conclusively resolved" by reference to an existing CBA. *Lingle,* in fact, expressly relied on *Buell,* see 486 U. S., at 411–412, just as earlier RLA cases have drawn analogies to LMRA principles, see, *e. g., Machinists* v. *Central Airlines, Inc.,* 372 U. S. 682, 692 (1963). Given this convergence in the pre-emption standards under the two statutes, we conclude that *Lingle* provides an appropriate framework for addressing pre-emption under the RLA, and we adopt the *Lingle* standard to resolve claims of RLA pre-emption.[9]

E

In reaching this conclusion, we reject petitioners' suggestion that this contract-dependent standard for minor dis-

---

[9] It is true, as petitioners observe, that the RLA and the LMRA are not identical in language, history, and purpose. The LMRA, unlike the RLA, does not mandate arbitration, nor does it prescribe the types of disputes to be submitted to arbitration under bargaining agreements. Nonetheless, the common purposes of the two statutes, the parallel development of RLA and LMRA pre-emption law, see, *e. g., Machinists* v. *Central Airlines, Inc.,* 372 U. S. 682, 691–692 (1963); *Allis-Chalmers Corp.* v. *Lueck,* 471 U. S. 202, 210 (1985), and the desirability of having a uniform common law of labor law pre-emption, cf. *Trainmen* v. *Jacksonville Terminal Co.,* 394 U. S. 369, 383–384 (1969), support the application of the *Lingle* standard in RLA cases as well.

Lower courts, too, have recognized the appropriateness of the *Lingle* standard to RLA pre-emption analysis. See, *e. g., Anderson* v. *American Airlines, Inc.,* 2 F. 3d 590, 595 (CA5 1993) (applying *Lingle* to analyze RLA pre-emption); *Davies* v. *American Airlines, Inc.,* 971 F. 2d 463, 466–467 (CA10 1992) (same), cert. denied, 508 U. S. 950 (1993); *O'Brien* v. *Consolidated Rail Corp.,* 972 F. 2d 1, 4 (CA1 1992) (same), cert. denied, 506 U. S. 1054 (1993); *Maher* v. *New Jersey Transit Rail Operations, Inc.,* 125 N. J. 455, 472–473, 593 A. 2d 750, 758 (1991) (same). But see, *e. g., Hubbard* v. *United Airlines, Inc.,* 927 F. 2d 1094, 1097 (CA9 1991) (*Lingle* does not govern in RLA cases); *Lorenz* v. *CSX Transp., Inc.,* 980 F. 2d 263, 268 (CA4 1992) (same).

putes is inconsistent with two of our prior cases, *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711 (1945), and *Conrail,* 491 U. S., at 302. *Burley* was not a pre-emption case. Rather, it concerned the authority of union officials to settle railroad workers' individual claims for damages for alleged violations of the CBA. The railroad urged that the union representative, who had the authority to negotiate CBA's in major disputes, enjoyed similar authority to settle individual claims in minor disputes. In the course of rejecting this claim, the Court described minor disputes as including the "omitted case," that is, one "founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, *e. g.,* claims on account of personal injuries." 325 U. S., at 723.

This language is sweeping, but its effect is limited. The conflict in *Burley,* which the parties agreed was a minor dispute, concerned the terms of a CBA, and not some other "incident of the employment relationship," or any "omitted case." These references, therefore, are dicta. Moreover, even the "omitted case" dictum logically can refer to a norm that the parties have created but have omitted from the CBA's *explicit* language, rather than to a norm established by a legislature or a court.[10] Finally, *Burley's* one specific example of an "omitted case"—claims for personal injury that do not depend on the contract—was found in *Buell* to be outside the RLA's exclusive jurisdiction. Nonetheless, to avoid any confusion, we expressly disavow any language in

---

[10] See *Detroit & Toledo Shore Line R. Co.* v. *Transportation Union,* 396 U. S. 142, 154–155 (1969) ("Where a condition is satisfactorily tolerable to both sides, it is often *omitted* from the agreement, and it has been suggested that this practice is more frequent in the railroad industry than in most others") (emphasis added); *Consolidated Rail Corporation* v. *Railway Labor Executives' Assn.,* 491 U. S. 299, 311–312 (1989) (recognizing that CBA's include implied terms arising from "'practice, usage and custom'"); see also *Steelworkers* v. *Warrior & Gulf Nav. Co.,* 363 U. S. 574, 578–579 (1960) (a CBA is "more than a contract; it is a generalized code to govern a myriad of cases which the draft[ers] cannot wholly anticipate").

*Burley* suggesting that minor disputes encompass state-law claims that exist independent of the CBA.

*Conrail,* like *Burley,* involved no pre-emption analysis. The parties agreed that the dispute—a workers' challenge to the railroad's drug-testing policies—was governed by the RLA, because Conrail's policy of conducting physical examinations was an implied term of the CBA. 491 U. S., at 301. The only question before the Court was whether the employer's drug-testing policy constituted an attempt to add a new term to the existing agreement, making it a major dispute subject to a "protracted process" of bargaining and mediation, *id.,* at 303, or whether the testing reflected the employer's interpretation and application of an implied term of the existing contract, producing a minor dispute subject to a less onerous process of arbitration. We concluded that the dispute was minor, stating that "[t]he distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing [CBA]." *Id.,* at 305, citing Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L. J. 567, 568, 576 (1937). Obviously, to say that a minor dispute can be "conclusively resolved" by interpreting the CBA is another way of saying that the dispute does not involve rights that exist independent of the CBA.

Petitioners, however, pin their hopes on the observation that "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is *arguably justified* by the terms of the parties' collective-bargaining agreement." 491 U. S., at 307 (emphasis added). They argue that this action involves a minor dispute because the termination of respondent was "arguably justified" by the CBA's provision permitting termination for "just cause." This "arguably justified" standard, however, was employed only for policing the line between major and minor disputes. Recognizing that accepting a party's characterization of a dispute as "minor" ran the risk of under-

cutting the RLA's prohibition "against unilateral imposition of new contractual terms," *id.*, at 306, the Court held that a dispute would be deemed minor only if there was a sincere, nonfrivolous argument that it turned on the application of the existing agreement, that is, if it was "arguably justified" by that agreement. Obviously, this test said nothing about the threshold question whether the dispute was subject to the RLA in the first place.

## III

Returning to the action before us, the question under *Lingle* is whether respondent's state-law wrongful-discharge claims are independent of the CBA. Petitioners argue that resort to the CBA is necessary to determine whether respondent, in fact, was discharged. This argument is foreclosed by *Lingle* itself. *Lingle* teaches that the issue to be decided in this action—whether the employer's actions make out the element of discharge under Hawaii law—is a "purely factual questio[n]." 486 U. S., at 407.

Nor are we persuaded by petitioners' contention that the state tort claims require a determination whether the discharge, if any, was justified by respondent's failure to sign the maintenance record, as the CBA required him to do. Although such a determination would be required with regard to respondent's separate allegation of discharge in violation of the CBA, the District Court dismissed that count as pre-empted by the RLA, and respondent does not challenge that dismissal. The state tort claims, by contrast, require only the purely factual inquiry into any retaliatory motive of the employer.

Accordingly, we agree with the Supreme Court of Hawaii that respondent's claims for discharge in violation of public policy and in violation of the Hawaii Whistleblower Protection Act are not pre-empted by the RLA, and we affirm that court's judgment.

*It is so ordered.*