**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SCOTT R. WOLFE, *Plaintiff-Appellant*, v. BNSF RAILWAY COMPANY, A Delaware corporation, *Defendant-Appellee*. | No. 12-35054 D.C. No. 1:09-cv-00166-RFC OPINION |

Appeal from the United States District Court
for the District of Montana
Richard F. Cebull, Senior District Judge, Presiding

Argued and Submitted
July 11, 2013—Portland, Oregon

Filed April 23, 2014

Before: Harry Pregerson, Mary H. Murguia,
and Morgan Christen, Circuit Judges.

Opinion by Judge Pregerson

# SUMMARY*

## Preemption / Railway Labor Act

The panel affirmed in part and reversed in part the district court's summary judgment entered in favor of the BNSF Railway Company in a diversity action brought by a railway employee alleging railway mismanagement and misconduct.

The plaintiff-employee was working as a track inspector when his hi-rail truck collided head-on with a freight train. After disciplinary proceedings, BNSF dismissed the employee. The employee brought this action after he was reinstated without backpay.

The panel affirmed the district court's ruling that the employee's state law claim—alleging injury caused by BNSF's misconduct in employee disciplinary proceedings under the collective bargaining agreement ("CBA")—was preempted by the federal Railway Labor Act. The panel reversed the district court's summary judgment on the employee's state law claim against BNSF concerning BNSF's alleged negligent mismanagement that resulted in a head-on collision. The panel held that the employee's claim concerning BNSF's conduct leading to the collision was independent of the CBA and did not require interpretation of the CBA, and therefore the claim was not preempted by the Railway Labor Act. Finally, the panel reversed the district court's ruling dismissing Wolfe's punitive damages claim.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Sharon L. Van Dyck (argued), Van Dyck Law Firm, PLLC, St. Louis Park, Minnesota, for Plaintiff-Appellant.

Donald J. Munro (argued), Jones Day, Washington, D.C.; Michelle T. Friend, Hedger Friend, PLLC, Billings, Montana, for Defendant-Appellee.

## OPINION

PREGERSON, Circuit Judge:

Plaintiff-Appellant Scott Wolfe ("Wolfe") appeals the district court's order granting summary judgment in favor of Defendant-Appellee BNSF Railway Company ("BNSF") on Wolfe's claims under Montana Code Annotated ("MCA") § 39-2-703. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Wolfe is a longtime employee of BNSF. In December 2008, Wolfe worked in Shelby, Montana, as a track inspector for the first time. Before then, he worked primarily as a foreman and a machine operator at BNSF. BNSF mechanic Robert Flesche provided Wolfe with a hi-rail truck, which can be driven along rails. Flesche had previously complained about the hi-rail truck's poor condition to BNSF. Flesche stated that "nobody wanted to be assigned that truck, certainly nobody like[d] it for a h[i-]rail truck." Flesche said "[e]verything was just more difficult with that truck. . . . [I]t

was a rough riding truck, very rough riding." Flesche had "told the railroad, it was a bad [truck], [and that] it sure was not suited for track inspection." Nevertheless, Flesche gave Wolfe the truck because it was the only one available.

Flesche quickly showed Wolfe how to use the hi-rail attachments on the truck. The hi-rail attachments were four heavy mechanical assemblies, two in front and two in back, that were supposed to drop the truck's wheels onto the rail and lock them in place, keeping the truck on the rails like a standard railroad car. Flesche also "showed [Wolfe] a little about" the truck's Hi-rail Limits Compliance System ("HLCS"). The HLCS is a GPS system that identifies where vehicles are on the tracks, interfaces with BNSF's computer system, and ensures that employees stay within their railroad track authorities (the boundaries of the areas to which they have been assigned). Wolfe previously had attended mandatory training on using the HLCS. At that training, managers read material on the HLCS to the employees, but there was no demonstration on how to work the system. Flesche concluded after observing Wolfe that "[Wolfe] had not ever been trained on using [the HLCS]."

On the morning of December 18, 2008, Wolfe requested track authority from the dispatcher, James Trotchie, to go east on a particular stretch of track. Trotchie misheard Wolfe's request for permission to go "east" and, assuming that he wanted to go west, verbally approved Wolfe's request while assigning him track authority in the HLCS to go west. Wolfe proceeded to go east on the rails in his hi-rail truck.

Approximately four miles from where Wolfe began to travel on the rails, Wolfe encountered a freight train head on.

Wolfe jumped off the truck before it was hit by the train. The truck was damaged, but Wolfe was not physically injured.

Wolfe is a member of the Brotherhood of Maintenance of Way Employes union (the "Union"). The Union has a collective bargaining agreement ("CBA") with BNSF. Under Rule 40 of the CBA, an employee who has worked 60 days or more, such as Wolfe, "will not be disciplined or dismissed until after a fair and impartial investigation has been held." BNSF conducted two formal investigations of Wolfe's accident pursuant to Rule 40 to determine (1) whether Wolfe failed to activate the HLCS on his truck and (2) whether Wolfe failed to operate within the limits of his track authority at the time of the accident. After the investigations, BNSF determined that Wolfe committed the alleged misconduct. Wolfe received a 30-day suspension for his failure to activate the HLCS and was dismissed for his failure to have main track authority.

Wolfe challenged his dismissal. On Wolfe's behalf, the Union referred the grievance to the National Railroad Adjustment Board (the "Adjustment Board"). The Adjustment Board was created under the Railway Labor Act to resolve disputes between carriers and their employees. 45 U.S.C. § 153. The Adjustment Board (1) determined that BNSF proved that Wolfe failed to engage his HLCS and violated his track authority, (2) affirmed Wolfe's 30-day suspension for the HLCS violation as reasonable, and (3) reduced Wolfe's dismissal to a long-term suspension because it found that "dismissal was too severe a penalty" for the track authority violation. The Adjustment Board ordered that Wolfe be reinstated with his seniority unimpaired, but decided that he was not entitled to backpay.

Wolfe filed a complaint in Montana state court asserting claims under MCA § 39-2-703, which governs the liability of railways for negligent mismanagement. BNSF removed the claims to federal court based on diversity jurisdiction. Wolfe's amended complaint states two claims under MCA § 39-2-703: (1) that BNSF's mismanagement and the negligence of its employees caused the train collision; and (2) that BNSF mismanaged the subsequent investigation and disciplinary proceedings.

BNSF filed a motion for summary judgment on the ground that Wolfe's state-law claims were preempted by the Railway Labor Act, 45 U.S.C. § 151-88. The district court granted the motion. The district court found that Wolfe's claims were preempted because "[t]he facts surrounding [Wolfe's] claim[s] appear to be inextricably intertwined with the grievance procedures controlled by the CBA." On appeal, Wolfe concedes that his claim challenging the BNSF's investigation and disciplinary proceedings, which were governed by the CBA, is preempted, but contends that the district court erred in granting summary judgment on Wolfe's Montana-law claim against BNSF concerning the alleged negligent mismanagement that resulted in the head-on collision.

## STANDARD OF REVIEW

We review a district court's ruling regarding preemption de novo. *Espinal v. Nw. Airlines*, 90 F.3d 1452, 1455 (9th Cir. 1996). We review a grant of summary judgment de novo. *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1103 (9th Cir. 1998).

## DISCUSSION

### A. Preemption Under the Railway Labor Act (RLA)

"[T]o promote stability in labor-management relations," the RLA requires arbitration for two classes of disputes concerning "rates of pay, rules or working conditions." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (internal quotation marks and citations omitted).[1] The first class—major disputes—concerns the formation or negotiation of collective bargaining agreements. *Id*. The second class—minor disputes—concerns "'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.'" *Id.* at 253 (quoting *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 33 (1957)). The parties agree that the only way Wolfe's claim is preempted is if the conflict over the collision constitutes a minor dispute. BNSF "bears the burden of proof on its preemption defense." *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514, 1526 n.6 (9th Cir. 1995).

Before the Supreme Court's decision in *Norris*, "this circuit considered the scope of minor disputes under the RLA to be quite expansive." *Espinal*, 90 F.3d at 1456. But *Norris* "substantially narrowed the scope of RLA preemption." *Id.* In *Norris*, the Supreme Court observed that a state-law claim is preempted by the RLA only when the state claim "involve[s] duties and rights created or defined by [a] CBA" and is therefore "dependent on the interpretation of a CBA." 512 U.S. at 258, 262. In contrast, "a state-law cause of action

---

[1] The RLA "was extended in 1936 to cover the airline industry." *Norris*, 512 U.S. at 248.

is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA." *Id.* at 260.

Applying the *Norris* framework, we conclude that Wolfe's state claim concerning the collision is not preempted.

## B. Montana's Broad Statutory Protection of Railway Employees

Under MCA § 39-2-703(1), a

> corporation operating a railway or railroad in [Montana] is liable for all damages sustained by any employee of the . . . corporation in consequence of the neglect of any other employee of the . . . corporation or by the mismanagement of any other employee . . . when the neglect, mismanagement, or wrongs are in any manner connected with the use and operation of a railway or railroad on or about which the employee is employed.

The purpose of the statute is twofold. First, the statute "eliminate[s] the fellow-servant defense to common-law causes of action," enabling a railroad employee to recover from an employer for the negligent acts of his co-workers. *Haux v. Mont. Rail Link, Inc.*, 97 P.3d 540, 543 (Mont. 2004); *see also Dillon v. Great N. Ry. Co.*, 100 P. 960, 961–62 (Mont. 1909). Second, the statute "provides for a cause of action for mismanagement." *Haux*, 97 P.3d at 543. The language of the statute, though expansive, "is clear, unambiguous, direct and certain. . . . The plain meaning of the language . . . requires that a railroad be held liable for mismanagement." *Id*.

In *Winslow v. Montana Rail Link, Inc.*, the Montana Supreme Court recognized that MCA § 39-2-703 employs "very broad language" in defining the right of railway employees to sue for "all damages" resulting from a railway's negligence or mismanagement, including when that conduct results in the employee's discharge from employment. 16 P.3d 992, 996 (Mont. 2000) ("*Winslow I*"); 121 P.3d 506, 511–12 (Mont. 2005) ("*Winslow II*"). The right of railway employees to sue on the basis of negligence or mismanagement resulting in termination may be unusual in other jurisdictions, but such a right is undoubtedly recognized in Montana.

## C. Wolfe's Claim Concerning the Collision is Not Preempted Under the RLA.

### 1. Wolfe's Claim Does Not Require Interpretation of the CBA.

Under *Norris*, the crucial inquiry in determining whether a cause of action under state law is preempted by the RLA is whether the "state-law claim is dependent on the interpretation of a CBA." *Norris*, 512 U.S. at 262. If the cause of action requires interpretation of a CBA, then the claim is preempted. *Id.* at 262–63. "The plaintiff's claim is the touchstone for this analysis; the need to interpret the CBA must inhere in the nature of the plaintiff's claim." *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 691 (9th Cir. 2001). "As long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent'

of the [CBA] for . . . pre-emption purposes." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 410 (1988).[2]

In *Winslow*, the Montana Supreme Court held that a claim for negligent mismanagement under MCA § 39-2-703 was not preempted by the RLA. *Winslow I*, 16 P.3d at 996–97; *Winslow II*, 121 P.3d at 513. In that case, an employee was diagnosed with a hernia in 1992, and in 1995 it was severely aggravated while he performed his duties. *Winslow II*, 121 P.3d at 509. Pursuant to a CBA, the employer conducted a hearing to determine if the employee had fraudulently withheld information regarding his 1992 injury. *Id.* at 510. As a result of the hearing, the employee was terminated. *Id*. A special board of adjustment[3] affirmed that the railroad had the right under the CBA to terminate the employee for his dishonesty. *Id*.

The employee sued under MCA § 39-2-703, alleging that the railroad had "negligently mismanaged its investigation [of his injuries] and that he was wrongfully discharged." *Id*. (internal quotation marks omitted). At trial, the jury found that each party was negligent, allocating 61.25% liability to

---

[2] The standard for preemption under the RLA is "virtually identical to the pre-emption standard" under § 301 of the Labor Management Relations Act established by *Lingle*. *Norris*, 512 U.S. at 260.

[3] Under the RLA, union grievances may be referred to "a special board of adjustment" to resolve the dispute that would "otherwise [be] referable to the Adjustment Board." 45 U.S.C. § 153(x). A decision by a special board of adjustment is enforceable "in the same manner and subject to the same provisions that apply to proceedings for enforcement of compliance with awards of the Adjustment Board." *Id*. Winslow's CBA provided for the arbitration of his case before a special adjustment board. *Winslow II*, 121 P.3d at 510.

the railroad, 38.75% to the employee, and awarding the employee compensatory damages. *Id*.

The railroad appealed, arguing that Winslow's claim was preempted by the RLA because "his state-law claim of negligent mismanagement . . . required the court or jury to interpret existing provisions of his CBA." *Id.* at 512. The Montana Supreme Court disagreed, holding that Winslow's claim was not preempted because it was "premised upon . . . a state law claim" which was "independent of whatever labor agreement might govern." *Id.* at 513 (internal quotation marks omitted); *see also Winslow I*, 16 P.3d at 996–97.

Similarly, applying the rule set forth in *Norris* and *Lingle*, we have consistently held that claims for employer negligence are not preempted by the RLA when the right involved is independent of a CBA. *See Wharf v. Burlington N. R.R. Co.*, 60 F.3d 631, 635-636 (9th Cir. 1995) (holding that employee's claim for damages for personal injury caused by the railroad's negligence was not preempted because "[t]he [RLA] . . . has no application to a claim for damages to the employee resulting from the negligence of an employer railroad" (omission in original) (internal quotation marks omitted)); *see also Ward v. Circus Circus Casinos, Inc.*, 473 F.3d 994, 999 (9th Cir. 2007) (finding that employees' state claims against their employer for negligently hiring and supervising its security guards were not preempted by § 301 of the Labor Management Relations Act because they "d[id] not require interpretation of [a] CBA"). In contrast, when a duty of care owed to the employee derives solely from a CBA, the claim is preempted. *See Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 860–62 (1987) (holding that employee's negligence claim against her union was preempted because, unlike an employer, the union owed

plaintiff a duty only by "accepting a duty of care through [the] contractual arrangement" of a CBA).

Wolfe asserts BNSF negligently mismanaged him in the following respects: (1) BNSF failed to properly train him on how to use the HLCS and provided him with a hi-rail truck that was in poor operating condition, and (2) the dispatcher failed to provide him with proper track authority and failed to warn him of the oncoming freight train. Wolfe argues that this negligent misconduct caused the accident that led to his termination, and that he has suffered damages as a result of this termination. Here, as in *Winslow*, Wolfe's cause of action for negligent mismanagement does not arise out of a CBA.

To determine whether a claim arises out of a CBA, we first "determine 'whether the CBA must serve as the measuring rod in determining whether [the defendant] acted reasonably.'" *Espinal*, 90 F.3d at 1457 (alteration in original) (quoting *Jimeno*, 66 F.3d at 1524). A claim does not involve interpretation of a CBA where the CBA is "silent" on how the employer may address the issues raised by an employee's claim. *See Jimeno*, 66 F.3d at 1524 (holding that employee's disability claim did not require interpretation of the CBA where the CBA was "silent regarding the ways that management may either restructure positions to modify workload or design special arrangements . . . to accommodate employees"). Further, where a CBA contains general provisions involving the same subject matter as an employee's claim but does not provide a "framework" for how the employer may address the issue in dispute, that claim does not require interpretation of the CBA. *See Espinal*, 90 F.3d at 1457 (holding that employee's state disability claim was not preempted where the CBA contained general

provisions on physical fitness but "d[id] not provide a framework for challenging determinations that an employee is not physically fit" or "a mechanism to accommodate disabled workers").

As in *Jimeno*, BNSF has not identified any provision in the CBA that would require interpretation of the CBA to resolve Wolfe's negligent mismanagement claim. There are no provisions in the CBA regarding (1) how BNSF should have managed training employees for the HLCS, (2) how BNSF should maintain hi-rail trucks to ensure that they are in safe operating condition, (3) how BNSF should handle claims for co-worker negligence, or (4) how BNSF should handle claims that it mismanaged its employees. Further, as in *Espinal*, although the CBA generally provides that an employee may complain of unjust treatment to BNSF, it does not provide a framework for resolving challenges involving negligence or mismanagement. Thus, the CBA does not govern Wolfe's claim.

Wolfe's claim that BNSF mismanaged the employees who negligently provided him with faulty equipment, failed to train him properly on how to use the HLCS, and provided him with incorrect track authority "can be analyzed entirely apart from the CBA." *Espinal*, 90 F.3d at 1457. In other words, Wolfe's "right to be free from mismanagement . . . is independent of any negotiated labor agreement." *Winslow I*, 16 P.3d at 997.

We therefore conclude that Wolfe's claim concerning the conduct leading to the collision is independent of the CBA and does not require interpretation of the CBA. Thus, Wolfe's claim is not preempted by the RLA.

**2. BNSF's Disciplinary Proceedings Are Not the Legal Cause of Wolfe's Suspension and Termination.**

BNSF argues that Wolfe's claim is preempted on the ground that "[t]he *only* injury asserted by Mr. Wolfe is dismissal from employment," rather than personal injury arising from the accident. Thus, because the collision led to the CBA proceedings, which then led to Wolfe's firing, Wolfe's claim would require a court to evaluate whether Wolfe was properly disciplined under the CBA. We disagree.

First, we note again that MCA § 39-2-703, while perhaps unusual in its breadth, is exceedingly clear. Montana law confers on Wolfe, independently of the CBA, the right not to be negligently injured by his coworkers or employer. This right protects Wolfe not only from personal injuries, but also from negligent firing. *Winslow I*, 16 P.3d at 995–96; *Winslow II*, 121 P.3d at 511–12. Thus, under Montana law, Wolfe has sufficiently alleged an injury that was suffered as a result of BNSF's negligence (the actions leading up to the collision). This causal inquiry does not require interpretation of the CBA.

Further, it is well-established law that, when an employee has been terminated pursuant to the CBA's provisions, that employee may assert a separate and independent state claim challenging his termination. *See Norris*, 512 U.S. at 249–51, 266 (holding that employee who was terminated after a grievance hearing under the CBA could bring a state-law claim for wrongful discharge); *Saridakis v. United Airlines*, 166 F.3d 1272, 1277 (9th Cir. 1999) (stating that the Supreme Court has rejected the argument that a state-law claim is preempted because it "involve[s] the question whether [the

employee] was fired pursuant to the CBA's provisions"); *Winslow II*, 121 P.3d at 510, 513 (holding that employee whose termination under the CBA was affirmed by a special adjustment board could bring a claim under MCA § 39-2-703 challenging his termination). If disciplinary proceedings pursuant to a CBA and resulting in an employee's termination constituted the legal cause of that termination for all purposes, the employee could never assert an independent state-law claim.

When an employee is terminated following proceedings conducted in accordance with a CBA, there are two distinct inquiries: (1) whether the "discharge [was] in violation of the CBA"; and (2) "the purely factual inquiry" into the circumstances underlying the termination. *Norris*, 512 U.S. at 266. The first inquiry requires interpretation of the CBA. *Id.* But the second inquiry into "'purely factual questions' about an employee's conduct or an employer's conduct and motives do[es] not 'requir[e] a court to interpret any term of a collective-bargaining agreement.'" *Id.* at 261–62 (quoting *Lingle*, 486 U.S. at 407 (second alteration in original)). This is so even if the two inquiries "would require addressing *precisely the same set of facts*." *Lingle*, 486 U.S. at 410 (emphasis added); *see Wharf*, 60 F.3d at 636 (holding that plaintiff's state claim for damages was not preempted "even if a new trial on damages would require the court to examine facts that would also be relevant to a wrongful discharge claim under the RLA"). Thus, resolving an independent state-law claim does not require a court to "resort to the CBA . . . to determine whether [the employee], in fact, was discharged" or to determine whether the employee's termination was justified by the CBA. *Norris*, 512 U.S. at 266.

*Fennessy v. Southwest Airlines*, 91 F.3d 1359 (9th Cir. 1996), illustrates these two distinct inquiries. There, we held that an employee whose termination for violations of a CBA was upheld by an Adjustment Board could bring an independent claim challenging his termination. *Id*. at 1362. In *Fennessy*, an airline employee hit an aircraft with a cart that he was driving, scratching the plane. *Id.* at 1361. The employee was terminated after the airline "held a factfinding session" in accordance with the CBA and determined the employee damaged the aircraft. *Id.* "After a hearing, a Systems Board of Adjustment . . . upheld [the employee's] termination." *Id.*

The employee then filed a lawsuit in federal court, asserting a claim under 45 U.S.C. § 152, on the ground that he was terminated in retaliation for engaging in union activities. *Id.* Under § 152, an employee has a private right of action for wrongful discharge. *Id.* at 1362–65. The airline contended that the employee's claim constituted a minor dispute under the RLA. We disagreed.

We acknowledged that the grievance before "the Adjustment Board [was] unquestionably . . . a minor dispute." *Id* at 1361. We held that "[t]he Adjustment Board's decision is binding on [the employee] with regard to what it decided: that his discharge did not violate the [CBA]." *Id.* at 1361–62. But "[the employee] did not seek review of the Board's decision." *Id.* at 1362. "Instead, he brought []his action in district court, alleging that his discharge . . . gave rise to an independent statutory claim under 45 U.S.C. § 152." *Id.* We held that "the mere fact that [the employee's] discharge could be grieved on contractual grounds under the CBA does not mean that his statutory claim under the RLA is a minor dispute." *Id.*

As in *Fennessy*, Wolfe had a related minor dispute that was submitted to arbitration before the Adjustment Board; similarly, the Adjustment Board's decision here binds Wolfe with regard to its finding that Wolfe's suspension and withholding of back pay did not violate the CBA. But Wolfe does not seek judicial review of the Adjustment Board's decision. He brought suit under MCA § 39-2-703 alleging that he suffered damages because of the negligence and mismanagement of BNSF's employees, a state claim independent of the CBA. The issue to be decided here is whether BNSF's and its employees' conduct constitutes negligence and mismanagement under Montana law. *See Norris*, 512 U.S. at 266 (holding that the "issue to be decided in this [non-preempted] action [is] whether the employer's actions make out the element of [wrongful] discharge under Hawaii law"). Wolfe's state claim will require a factual inquiry into Wolfe's conduct, the dispatcher's conduct, and BNSF's conduct leading up to the head-on collision. But that is not sufficient to establish preemption. *Id.* at 261–62. To do that, BNSF would have to have shown that Wolfe's claim depended on an interpretation of the CBA. However, BNSF is unable to make such a showing.

## D. Wolfe's Punitive Damages Claim is Reinstated.

The parties agree that Wolfe's claim for punitive damages rises and falls with his underlying claim. Accordingly, because we find that Wolfe's claim based on conduct relating to the collision be reinstated, we find that Wolfe's punitive damages claim should be reinstated.

## CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the district court's order granting BNSF summary judgment. We **AFFIRM** the district court's ruling that Wolfe's claim alleging injury caused by BNSF's misconduct in proceedings pursuant to the CBA is preempted, as Wolfe concedes. We **REVERSE** the district court's ruling that Wolfe's claim that he suffered injury as a result of BNSF's and its employees' alleged negligence and mismanagement leading up to the collision is preempted and **REVERSE** the district court's ruling dismissing Wolfe's punitive damages claim. We **REMAND** for further proceedings consistent with this opinion. Costs awarded to Appellant.

**Affirmed in part, Reversed in part, and Remanded.**