**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 10 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SUSAN ADAMS,

      Plaintiff-Appellant,

v.

AMERICAN AIRLINES, INC.,

      Defendant-Appellee.

No. 98-5118
(D.C. No. 94-CV-1046-H)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **McKAY**, and **BRISCOE**, Circuit Judges.

Plaintiff-Appellant Susan Adams ("Adams") brought suit against her employer, Defendant-Appellee American Airlines ("American"), alleging Title VII sex discrimination, breach of contract, intentional infliction of emotional distress ("IIED"), and Title VII retaliation. The district court awarded summary judgment to American on Adams' sex discrimination and breach of contract claims, and following the first stage of a bifurcated trial, a jury found for

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

American on Adams' IIED and retaliation claims. Adams appeals the district court's summary judgment ruling as well as the district court's denial of her post-trial motion to amend the judgment or for judgment as a matter of law.

Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm in part and reverse and remand in part.[1]

**FACTS**

A. Plaintiff's Underlying Sex Discrimination Claim

Since August 1990, Adams has worked for American as an aircraft gyroscope mechanic in Tulsa, Oklahoma. Most of the American maintenance mechanics in Tulsa are subject to a Collective Bargaining Agreement ("CBA") with the Transport Workers Union ("TWU") Local 514. In 1993, two mechanics, Elmer Gonzalo and Richard Eichelberger, were reassigned to the gyro shop in Tulsa. Gonzalo and Eichelberger had more seniority than Adams, but neither had gyroscope repair experience. Because the mechanics' transfer affected shop

---

[1]Adams asserts on appeal that she also pled a claim for wrongful termination under Oklahoma law and that the district court erred in dismissing that claim. Adams failed to point out where in the record the district court dismissed that claim. In any event, it is not obvious that any such claim appears in her original Complaint or in her First or Second Amended Complaints. We find no merit to Adams' argument on this claim.

- 2 -

seniority, Adams and other gyro mechanics filed grievances under the CBA. These grievances were denied.

In the spring of 1994, American executed a reduction in force and laid off more than 700 employees, including Adams. Adams was the only gyro mechanic laid off; she had less seniority than Eichelberger and Gonzalo. Adams alleges that a supervisor, Tom Rock, told her that her layoff was "to protect these men's jobs." According to American, Adams was informed of her right to remain employed by exercising her seniority and bumping less senior employees in lower work classifications. Adams chose not to exercise these rights and instead accepted the layoff, retaining her recall rights under the CBA.

In October 1994, Adams filed an EEOC charge against American and TWU[2] alleging sex discrimination in connection with the mechanics' transfer, her layoff, and Rock's explanation. Adams subsequently filed the original complaint in this suit on November 9, 1994; American was served on January 31, 1995.

B. Adams' Retaliation Claim

January 31, 1995 Disputed Drug Test/Arbitration Award

Around January 25, 1995, American recalled Adams and approximately 19 other mechanics. Adams and one other recalled employee were asked to submit to

---

[2]TWU was later dropped from this suit.

urinalysis drug testing as required by Federal Aviation Administration ("FAA") and Department of Transportation ("DOT") regulations.[3]

On January 31, 1995, Adams reported for her drug test and was asked to provide two urine samples. The first was split into two parts and was tested pursuant to DOT and FAA regulations ("DOT/FAA specimen"). The second sample was for a test required by American's regulations ("Company specimen"). Adams noticed that her paperwork had been pre-completed, and that her UA specimens were neither split nor sealed in her presence.

The DOT/FAA specimen tested positive for marijuana. American notified Adams' husband (also an American technician) that Adams was drug positive, that she had been fired, and that she was not entitled to any spousal benefits. An American Medical Review Officer later notified Adams directly of her test result and suspended her. Adams has always maintained that the test results were false; however, a second split DOT/FAA sample also tested positive. The Company specimen was supposedly lost, found 15 days later, and then tested positive as well. Follow-up testing indicated that the samples may have been spoliated.

_____

[3]According to American, Adams was singled out because she had not been subject to random drug testing for a period greater than 180 days.

American fired Adams; Adams subsequently filed grievances for improper processing of the UA specimens. After being fired, Adams and her husband separated, and Adams was hospitalized for psychiatric care.

On December 18, 1995, an arbitration panel ruled that Adams had been discharged without just cause and ordered her to be reinstated with backpay. The arbitration award provided in relevant part:

> The Grievant's reinstatement and back pay entitlements are expressly conditioned on her successfully passing a drug test conducted in accordance with DOT standards. The Grievant will be placed in the Company's Conditional Reinstatement program for 1 year. The Grievant's status will be reviewed by the Company's Medical Department at the end of 1 year. The Arbitrator will retain jurisdiction of this grievance until the Grievant is released from the Conditional Reinstatement program.

(Emphasis added.) Thus, under the arbitration award, Adams' reinstatement was conditioned upon passing a return-to-work drug test and upon her placement in American's Conditional Reinstatement Program for twelve months.

Follow-Up Drug Testing at American

When an American employee is subjected to follow-up drug testing, he or she is submitted to an initial evaluation by a Substance Abuse Professional ("SAP"). The SAP supervises the employee's testing program, and functions somewhat like a counselor. The SAP does not administer the actual drug tests; rather, the SAP monitors the frequency of the testing and whether the employee actually appears for scheduled tests.

Follow-up drug testing of American employees is scheduled through a phone and computer system called the Interactive Voice Response System ("IVRS").[4] The employee accesses IVRS by calling in each day and entering an ID number; the IVRS then advises the employee whether to report for testing that day. The IVRS randomly selects the dates for testing; however, the frequency of the tests is established by a 21-level system. Each level has a specific ratio of tests, with Level 1 having the highest ratio of tests and Level 21 having the

[4]The IVRS is used for scheduling follow-up tests regardless of the reason for follow-up drug testing. Adams makes much of the differences between the program goals of the DOT follow-up testing, American's Conditional Reinstatement Program ("CRP"), and another drug testing program that is part of American's Employee Assistance Program ("EAP"). CRP is for reinstated employees who were fired after testing positive twice. Prior to entering this program, the employee signs a letter stating that he or she will resign unconditionally if caught testing positive again. CRP employees are also prohibited from holding safety-sensitive positions. Adams contends that, despite the language in her arbitration award, she was not truly in the CRP, as she did not sign a conditional reinstatement letter, and she continued to hold a safety-sensitive position. EAP follow-up testing is more akin to a drug and alcohol monitoring program, under which an employee voluntarily self-reports abuse problems before getting caught positive. If an EAP enrollee later tests positive for drugs, he or she is not immediately fired but instead undergoes counseling and increased drug testing. Adams contends that her drug testing frequency should not have been compared to that of EAP enrollees, because she did not volunteer to be drug tested, nor has she ever admitted to drug abuse.

We conclude, however, that the differences between various program goals are not determinative in light of the fact that, as discussed below, the SAP retains the discretion to manipulate an employee's IVRS level to increase or decrease overall testing, regardless of the employee's testing program.

lowest.  For example, Level 2 will randomly schedule 1 test in 5 days; Level 15 will schedule 3 tests in 60 days; Level 20 will schedule 1 test in 25 days.

When any American employee is entered into the IVRS system, the computer program automatically places him or her at Level 2; however, the SAP can enter the system and adjust the employee's IVRS level upward or downward. The SAP sets the employee's IVRS level with an overall estimate in mind of how frequently, in the SAP's clinical judgment, the employee should be tested over a minimum (DOT-mandated) one-year period.  An employee is not entitled to be placed at any particular level; IVRS placement remains in the discretion of the SAP.   Once the IVRS level is set, absent further intervention by the SAP, the computer program will automatically advance the employee to the next highest level once the testing period at the current level has expired.  For example, if an employee is placed at Level 2 and the SAP does not intervene, then after 5 days (and one scheduled test), the computer will automatically advance the employee to Level 3, even if for some reason the test was not actually taken.  In theory then, an employee may advance on his or her own all the way through the IVRS levels. However, it is common for SAPs, in their discretion, to adjust an employee's IVRS level, depending on how the employee is faring.  For example, if the computer schedules tests but the employee repeatedly fails to appear for testing, an SAP may lower the IVRS level to trigger more tests.   By lowering an

employee's IVRS level (thereby increasing the testing ratio), an SAP can boost the chances that the computer will schedule a test (or several tests) in the near future.

Adams' Follow-Up Testing

On January 16, 1996, Adams' SAP, Lela French, entered Adams into the IVRS system. The computer placed Adams at Level 2 (where all new participants enter), but French then immediately reset her to Level 15. French testified that she chose Level 15 because she estimated that over the 12-month period Adams would be tested (as required by the arbitration award), she would be scheduled for somewhere between "a minimum of 10 to 12 tests and a maximum of no more than 18 to 20 tests," given "allowances for the possibility that anywhere from 10 to 50 percent of the time somebody may not be available on the scheduled dates within that 12-month period."

In fact, after her December 20, 1995 return-to-work test, Adams was apparently tested 18 times between January 1996 and January 1997, not including one DOT random test on May 2, 1996, which was required as part of working in a safety-sensitive position (versus the ordered follow-up testing).[5]

---

[5]Specifically, the record shows that Adams was tested on the following dates in 1996: March 20, April 4, April 12, April 17, May 1, May 15, May 21, May 28, June 20, July 9, July 12, August 5, August 9, August 15, September 26, December 9, December 20; Adams' final test was January 10, 1997.

Adams contends, however, that she was tested unnecessarily frequently in retaliation for having filed the original sex discrimination suit. Specifically, Adams points to an incident on April 10, 1996, in which Lela French deleted Adams from IVRS Level 16 and reinstated her at Level 2, which Adams contends "stimulated 7 [urinalysis] tests in the following 40 days, coinciding remarkably with discovery in this lawsuit."

C. Adams' Lawsuit

Adams brought four claims against American: 1) sex discrimination under Title VII; 2) breach of employment contract; 3) retaliation under Title VII; and 4) intentional infliction of emotional distress under Oklahoma state law. The district court granted summary judgment to American on Adams' sex discrimination and contract claims, ruling that these were preempted by the Railway Labor Act, 45 U.S.C. §§ 151 et seq., as these claims were based on interpretations of the CBA.

However, the court found that there was an issue of material fact "as to whether Adams was tested more frequently from January 1996 to January 1997 than would be an employee, placed in the system at the same level [IVRS Level 15], who unfailingly tests negative over the same twelve-month period of time." The court further found that there was triable issue as to whether unnecessarily frequent testing was "attributable to retaliation and/or intentional wrongful

conduct." As a result, the court denied summary judgment for American on Adams' claims for retaliation and IIED and ordered trial on these two issues.

The court ordered that the trial on Adams' retaliation claim be bifurcated: during the first stage, Adams would be required to demonstrate that she had suffered an adverse employment action by being tested more frequently than other similarly situated employees. If Adams succeeded at this first stage, she would be required at the second stage to prove retaliatory animus.

Three weeks before trial, American produced drug testing data on Adams and 101 other employees who were on the IVRS within six months of when Adams entered the system and who remained in the system for a minimum of one year. The data included cases across all 21 IVRS levels and included 93 EAP employees deemed drug dependent, plus Adams and eight other non-dependent employees.

After a great deal of dispute about what subset of this data provided a proper group against which to compare Adams' follow-up drug testing, the district court ultimately decided to admit the data on all 102 employees, over Adams' heated objections that virtually all of the other 101 employees were not "similarly situated" to her. The court also rejected an attempt by Adams to have "similarly situated" defined for the jury as those employees set at Level 15, and concluded that the question of who was "similarly situated" was one of fact for

the jury to decide. The first stage of the bifurcated trial was held March 30 to April 3, 1998; after less than an hour of deliberation, the jury returned a special interrogatory verdict in favor of American, finding that Adams had not proved that she was tested more frequently than other similarly situated American employees[6] and thus had not suffered any adverse employment action. The trial never proceeded to the second (animus) stage. The district court denied Adams' post-trial motion to amend the judgment or alternatively, for judgment as a matter of law. Adams now appeals.

## DISCUSSION

Adams contends that the district court erred by admitting misleading data on all 102 employees and by refusing to define "similarly situated" employees for the jury on her retaliation claim. As a result, Adams argues, the court also erred in denying Adams' post-trial motion to amend the judgment or alternatively, for judgment as a matter of law. Adams also submits that the district court erred in ruling that her underlying Title VII sex discrimination claim and breach of contract claim were preempted by the Railway Labor Act. We will address first Adams' arguments regarding her retaliation claim, and then discuss her sex discrimination and breach of contract claims.

---

[6]The entire group of 102 employees was tested an average of 34.21 times, compared to Adams' 19 actual tests (18 scheduled tests plus one random DOT test).

A.  Retaliation

Admission of Comparative Data

We review a district court's admission of evidence for an abuse of discretion and will reverse the district court "only if we have a firm and definite belief that the trial court made a clear error in judgment." Faulkner v. Super Valu Stores, 3 F.3d 1419, 1433 (10th Cir. 1993). "If error is found in the admission of evidence, we will set aside a jury verdict only if the error prejudicially affects a substantial right of a party. Evidence admitted in error can only be prejudicial if it can be reasonably concluded that with or without such evidence, there would have been a contrary result." Sanjuan v. IBP, Inc., 160 F.3d 1291, 1296 (10th Cir. 1998) (internal quotations and citations omitted).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show: 1) that he or she engaged in protected opposition to discrimination; 2) that he or she suffered some adverse employment action by the defendant contemporaneous with or subsequent to the protected activity; and 3) that a causal connection existed between the protected opposition and the adverse employment action. See McGarry v. Board of County Comm'rs of the County of Pitkin, 175 F.3d 1193, 1201 (10th Cir. 1999).

It is undisputed that Adams' filing of the EEOC charge and the underlying sex discrimination suit satisfied the first prong of her retaliation claim. Thus, the

first stage of the bifurcated trial in this case was intended to establish whether Adams met the second prong; i.e., whether Adams in fact suffered an adverse employment action. Specifically, the district court framed the issue as whether Adams could show that she was drug tested more frequently than other "similarly situated" American employees.

Adams contends that the jury was misled by the admission of drug testing data on all 102 employees, and argues that the comparison was unfair because nearly all of these employees were not similarly situated to her, given that, inter alia, these employees entered the IVRS at various levels (and thus were subjected to differing ratios of tests). Adams submits that the only truly "similarly situated" employees were those non drug-dependent, DOT-tested persons who entered the IVRS at Level 15. Only one such person fit this description, and this person tested eight times (vs. 18 times for Adams).

We assume, without deciding, that, if Adams could prove in this case that the IVRS was deliberately manipulated such that Adams was subjected to significantly more drug tests than she otherwise would have been absent such manipulation, such evidence could establish adverse employment action for purposes of her prima facie case of retaliation. Reprisals by employers that fall short of termination or reduced benefits or wages may still be adverse. See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997).

Adams chose to prove the adverse employment action prong of her prima facie case by comparing her drug testing experience to others in the company. Without commenting on the propriety of that approach, it does seem to us within the proper exercise of discretion of the trial court to let all this evidence in of the drug testing of all 102 employees and then allow the parties simply to argue what subset, if any, is the most persuasive comparison.

In any event, evidence presented by American established that an employee who starts at IVRS Level 15 and is left to progress through the system for a full 365 days will be scheduled for 18 tests during that time. Even Adams' own expert conceded as much, admitting that in terms of the number of times Adams was actually tested over the entire year (18) compared to the expected testing frequency if she had been allowed to proceed uninterrupted from Level 15 forward for one year,[7] she was not adversely impacted.

_____

[7]American conceded that Adams had been bumped from a Level 16 to a Level 2 when French deleted her from the system on April 10, 1996. However, French testified that the deletion was a mistake; that when she reentered Adams into the system the computer placed her at Level 2 (the system default); and that she put Adams back to Level 15 when she discovered the mistake eight days later on April 18, 1996 (following a phone call from Adams complaining that she had been tested twice in one week). The evidence at trial established that only two tests were triggered in the eight days Adams was left at Level 2 (April 12 and 17) -- not seven tests over 40 days, as argued by Adams; and that French later intentionally bumped Adams to higher IVRS levels to speed Adams' progress through the system: on May 2, 1996, she moved Adams from Level 15 to Level 16; and on May 21, 1996 she moved Adams from Level 16 to Level 18. On

(continued...)

Thus, the evidence at trial established that Adams ultimately was tested the same number of times she would be expected to test had she been left to progress through the system on her own. Because Adams did not meet the second prong of her prima facie case of Title VII retaliation, and because we find no abuse of discretion in the district court's evidentiary rulings, we find no reversible error on this claim. See Sanjuan, 160 F.3d at 1296.

Jury Instructions

In a related argument, Adams contends that the district court erred in refusing to define "similarly situated" for the jury.

"We review a district court's decision on jury instructions, i.e., whether to give a particular instruction, for abuse of discretion. As for the instructions themselves, we conduct a de novo review to determine whether, as a whole, they correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." Allen v. Minnstar, Inc., 97 F.3d 1365, 1368 (10th Cir. 1996) (citations omitted).

On the other hand, "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to

[7](...continued)
January 15, 1997, when French deleted Adams from the IVRS system altogether (because the 12-month follow-up testing period had elapsed), Adams had progressed to Level 19.

consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51.

The court instructed the jury on similarly situated employees as follows:

> For Plaintiff to recover from Defendant on her claim of retaliation she must prove by the preponderance of the evidence several elements.
>
> The only element before you at this time is whether Plaintiff has established by a preponderance of the evidence that she suffered what is described in the law as "an adverse employment action contemporaneous with or subsequent to her protected activity." What that means in this case is whether Plaintiff has established by a preponderance of the evidence that she was drug tested more frequently than other similarly situated employees while she was in the follow-up testing program.

Adams did not offer a separate instruction defining similarly situated employees, and only suggested one minor amendment to the above-quoted instruction, i.e., inserting "at the same level" or "at level 15" after the words "follow up testing". The court rejected the suggestion, and when the court later asked the parties if they had any further objections to the instructions, Adams' counsel said no. On these facts, we conclude that Adams failed to preserve the objection. However, even reviewing the instruction for plain error, we find no error. The jury instructions, as delivered, fairly and adequately presented plaintiff's case to the jury.

Rule 50 and 59 Motions

In turn, because Adams' Fed. R. Civ. P. 50 and 59 motions hinge on the district court's alleged erroneous admission of American's statistics on drug testing frequency and failure to instruct the jury on who was a "similarly situated" employee, in light of our conclusions above, we find no error in the district court's denial of these motions. See Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1251 (10th Cir. 1992) (error in the denial of a Rule 50 motion is found only "if the evidence conclusively favors the moving party and is susceptible to no reasonable inferences that would sustain the nonmoving party's position.").


B. Title VII Sex Discrimination and Breach of Contract

The district court granted summary judgment to defendants on Adams' Title VII sex discrimination claim and her contract claim, ruling that these were preempted by the Railway Labor Act, 45 U.S.C. §§ 151 et seq ("RLA").  We review the grant of summary judgment de novo. See Woodman v. Runyon, 132 F.3d 1330, 1339 (10th Cir. 1997).

The RLA, which was extended in 1936 to cover the airline industry, sets up a mandatory arbitral mechanism to handle major and minor labor disputes.  See Hawaiian Airlines Inc. v. Norris, 512 U.S. 246, 248 (1994).  The RLA provides that all "minor" disputes must be resolved in mandatory arbitration before the

- 17 -

Railway Labor Board, and that federal and state courts lack jurisdiction over such claims.  See 45 U.S.C. § 151(a); Deneen v. Northwest Airlines, Inc., 132 F.3d 431, 439 (8th Cir. 1998).  "Minor" disputes are those that "grow[] out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i). In other words, minor disputes, which the RLA preempts, are grounded in the CBA.

RLA preemption is a complicated issue marked by somewhat imprecise and often conflicting language in the cases that discuss it.  Under Hawaiian Airlines, the RLA does not preempt causes of action to enforce rights that are "independent of" the CBA.  See Hawaiian Airlines, 512 U.S. at 256.  The RLA does, however, preempt those claims that are "inextricably intertwined" with the CBA.  See Fry v. Airline Pilots Ass'n, 88 F.3d 831, 836 (10th Cir. 1996) (preemption of minor disputes under RLA extends to any suit that is inextricably intertwined with consideration of the terms of the labor contract).

Title VII Discrimination Claim

Adams contends that her Title VII sex discrimination claim stems from rights independent of the CBA and therefore is not preempted by the RLA.  We start by observing that most of the cases addressing whether the RLA preempts claims under federal anti-discrimination statutes have held that there is no preemption.  See, e.g., Saridakis v. United Airlines, 166 F.3d 1272 (9th Cir. 1999)

- 18 -

(ADA claim not preempted); Felt v. Atchison, Topeka & Santa Fe Ry. Co., 60 F.3d 1416, 1419 (9th Cir. 1995) (Title VII religious discrimination claim not preempted); McAlester v. United Airlines, 851 F.2d 1249 (10th Cir. 1988) (§ 1981 race discrimination claim not preempted); Norman v. Missouri Pacific R.R., 414 F.2d 73 (8th Cir. 1969) (Title VII race discrimination claim not preempted); cf. Hirras v. National R.R. Passenger Corp., 44 F.3d 278 (5th Cir. 1995) (reversing a district court's decision to dismiss a Title VII claim on the basis of RLA preemption). But see Schiltz v. Burlington Northern R.R., 115 F.3d 1407, 1414-15 (8th Cir. 1997) (finding ADEA claim preempted by RLA). Several factors persuade us that the RLA similarly does not preempt Adams' Title VII claim. We list these factors without deciding which is most important or dispositive to the issue. First, a cause of action under Title VII emanates from a source independent of the CBA. Second, in proving the elements of her Title VII claim, it is not necessary that Adams first establish a breach of the CBA. Third, a plaintiff's choice of evidence will not ordinarily drive the issue of preemption, particularly where, as is the case here, the evidence relating to the CBA goes to disprove the defendant's justification rather than to prove an element of the plaintiff's case. We therefore disagree with the district court that the RLA preempts Adams' Title VII claim.

We have considered American's argument that we affirm on alternative grounds. We find that argument without merit. First, we do not believe Adams' Title VII claim is untimely. She filed her grievance with the EEOC and the OHRC on October 26, 1994, 166 days after her layoff. Although Adams' discrimination claim may hinge on Eichelberger and Gonzalo being unqualified employees in the gyro shop who should have been laid off before her, the transfer of Gonzalo and Eichelberger into the gyro shop in June and July of 1993 is not necessarily a part of that claim.[8]

Second, the record indicates that Adams made a prima facie showing under Title VII and offered sufficient evidence of pretext to create a genuine dispute of material fact as to the validity of American's articulated legitimate nondiscriminatory reason.[9] Although we recognize that on remand, Adams' proof

_____

[8] Adams has not demonstrated that a continuing violation was present in this case, therefore she cannot allege that the transfer of Gonzalo and Eichelberger into the gyro shop was a discriminatory act tied to her Title VII claim.

[9] American's legitimate nondiscriminatory reason asserted that Adams' layoff in May 1994 was based solely on seniority, and that the CBA provided justification for transferring Gonzalo and Eichelberger into the gyro shop even if they were not qualified. (See Aplt. App. at 1239-41, 1271-72.) Adams' pretext evidence went toward showing that Gonzalo and Eichelberger should have been laid off before her because they were unqualified at the time of the layoff. (See Aplt. App. at 1292-93.) Adams presented some evidence that Gonzalo and Eichelberger were not qualified at the time of their transfer in June and July of 1993, and that one year of continuous assignment in the position was necessary before they could be considered automatically qualified. (See Aplt. App. at 1321-
(continued...)

of pretext will involve evidence as to whether the CBA was breached, we find that in this context, such evidence does not trigger preemption. Therefore, we reverse the summary judgment ruling on Adams' Title VII claim, and remand for the district court to consider the claim on the merits.

Contract Claim

Adams' contract claim, however, is clearly founded upon an alleged violation of the CBA. Because this claim indisputably involves the terms of the CBA, it was properly deemed by the district court to be preempted. We therefore affirm the award of summary judgment on this claim for the reasons stated by the district court.

**CONCLUSION**

We find no error in the district court's rulings on Adams' IIED and retaliation claims, nor do we find any error in the district court's ruling on Adams' breach of contract claim. We therefore AFFIRM those rulings. We do find error, however, in the district court's ruling on Adams' Title VII claim, and

[9](...continued)
22, 1292-93.) Although it appears that performance up to company standards of quality and quantity could result in Gonzalo and Eichelberger being considered qualified before they had been in the position for one year, we believe a genuine issue of material fact exists as to whether they were qualified in May 1994.

we REVERSE and REMAND for the district court to consider the merits of that claim.

                              ENTERED FOR THE COURT


                              David M. Ebel
                              Circuit Judge