LAMEZ WILLIAMS, Plaintiff v. AMERICAN EAGLE AIRLINES, INC., Defendant

No. COA10-267

(Filed 7 December 2010)

**1. Appeal and Error— preservation of issues—failure to argue**

Issues related to the trial court's rulings that were not specifically addressed in Defendant's brief or for which no reason or argument were made were deemed abandoned under N.C. R. App. P. 28(b)(6).

**2. Jurisdiction— subject matter jurisdiction—breach of employment contract—tortious interference with contract— Railway Labor Act**

The trial court lacked subject matter jurisdiction over plaintiff's claims for breach of employment contract and tortious interference with contract because those claims were preempted by the Railway Labor Act.

Appeal by Defendant from orders entered 3 June and 5 November 2009, by Judge Allen Baddour in Durham County Superior Court. Heard in the Court of Appeals 16 September 2010.

*Ross S. Sohm and Bartina L. Edwards, for plaintiff-appellee.*

*Ogletree, Deakins, Nash, Smoak & Stewart, P.C., by Thomas A. Farr and Phillip J. Strach, for defendant-appellant.*

JACKSON, Judge.

American Eagle Airlines, Inc. ("Defendant") appeals from orders entered on 3 June and 5 November 2009 denying Defendant's motion for judgment notwithstanding the verdict ("JNOV") and alternative motion for new trial made after entry of judgment upon a jury verdict in favor of Lamez Williams ("plaintiff") in the amount of $232,000.00. For the reasons stated herein, we vacate the judgment of the trial court and remand.

Defendant is a Delaware corporation engaged in the business of commercial aviation, conducting business in North Carolina, and employing more than 13,000 employees. Plaintiff was employed by Defendant as a fleet service clerk at Raleigh-Durham Airport on a part-time basis, working approximately twenty hours per week,

beginning 13 December 2004 and ending with her termination on 23 April 2007. Plaintiff's duties as a fleet service clerk included marshaling planes into the gate area, pushing planes away from the gate, collecting luggage from the ticketing area, loading and unloading luggage, cleaning the interiors of planes, and loading and unloading the galley areas with refreshments.

The terms and conditions of plaintiff's employment with Defendant as a fleet service clerk were governed by a collective bargaining agreement ("CBA") between Defendant and the Transport Worker's Union of America, AFL-CIO ("Union"). Plaintiff was a member of the Union and had served as a shop steward.

The CBA states in its preamble that it is "made and entered in accordance with the provisions of the Railway Labor Act . . . ." The Railway Labor Act ("RLA") is codified at Title 45, Chapter 8 of the United States Code. *See* 45 U.S.C. § 151 (2006) (providing that "[t]his Act may be cited as the 'Railway Labor Act.' "). The CBA further provides that Defendant recognizes the Union "as the sole bargaining agent for all Fleet Service employees employed by [Defendant]" and that, "in their behalf[,]" the Union has the authority "to negotiate and conclude an Agreement with [Defendant] with respect to rates of pay, rules and working conditions for all employees covered under this agreement . . . ."

Article 9 of the CBA addresses matters related to the seniority rights of fleet service clerks and consists of paragraphs labeled A through M. Paragraph H addresses factors which have a negative impact upon seniority status. In relevant part, it provides that, "[r]esignation, discharge for *just cause*, or failure to accept recall from layoff will result in forfeiture of seniority and all rights thereto." (emphasis added).

Article 12 of the CBA addresses matters related to the probationary period for fleet service clerks. Specifically, paragraph A of Article 12 states that "[n]ew employees will be considered on probation for the first six (6) months of active service." Paragraph A further specifies that, during the probationary period, "[p]robationary employees may be disciplined or discharged without recourse to the grievance and arbitration provisions . . . ." The grievance and arbitration provisions referred to in paragraph A of Article 12 are set forth in Articles 21 and 22 of the CBA, respectively.

Article 21 of the CBA establishes the grievance procedure for fleet service clerks. Paragraph A of Article 21 establishes a grievance

procedure for employees who believe that they have been "unjustly dealt with or that any provisions of [the] agreement [have] not been properly applied or interpreted . . . ." The grievance procedure set forth in Article 21 provides for the presentation and possible resolution of an employee grievance beginning with the employee's supervisor. If the decision of the supervisor is not satisfactory, the employee may appeal the supervisor's decision to the Regional Vice President of Field Service. If the decision of the Regional Vice President of Field Service is not satisfactory, that decision "may be appealed to the American Eagle Airlines, Inc. Board of Adjustment as provided for in Article 22 of [the] agreement . . . ."

Article 22 of the CBA establishes the Boards of Adjustment. Paragraph C of Article 22 establishes two types of boards of adjustment—a System Board and an Area Board—each having jurisdiction over particular types of matters. System Boards are granted jurisdiction "over disputes between the Company and the Union or any employee governed by this Agreement growing out of grievances involving interpretations or applications of this Agreement." Area Boards, on the other hand, are granted jurisdiction "over disputes between the Company and the Union involving discharge or discipline."

The boards of adjustment established by Article 22 of the CBA are for the purpose of conducting the arbitration system referred to in Article 12 of the CBA. Appeals related to discipline or discharge only can be resolved by majority vote of an Area Board. In the event a Board deadlocks, the final decision is made by a panel of three arbitrators consisting of a Company member of the Board, a Union member of the Board, and a jointly selected neutral arbitrator.

On or about 27 August 2006, plaintiff injured her left shoulder while she was unloading luggage from a plane. Plaintiff reported the injury; then she sought and received medical treatment. On 1 September 2006, plaintiff's doctor wrote a letter stating that plaintiff would be unable to return to work until 18 September 2006. On 5 September 2006, plaintiff signed two forms prepared by Defendant in connection with her work-related injury. The first form, entitled "Injured Employee Roles and Responsibilities," set forth the ways in which plaintiff was required to cooperate in the claims process during the time she was being treated for her injury. The second form, entitled "Injured Employee Information Letter," set forth twenty-three points of information for an injured employee, including the following relevant provisions:

18. Transitional Duty: You must notify your supervisor as soon as your doctor determines you can return to work. Both you and the company benefit when you return to work, even if your physical capabilities prevent you from performing your regular job. In most cases, Transitional Duty is available in your department. . . . Refusal of a Transitional Duty assignment may result in cancellation of state benefits, where applicable by state workers' compensation law.

. . . .

21. Fraud and Abuse: . . . Workers' compensation fraud includes the following:

. . . .

- Working at another job, or performing tasks inconsistent with medical claims, while receiving workers' compensation benefits

Workers' Compensation fraud is a violation of American Eagle's Rules of Conduct #34, and any employee found to have engaged in such conduct will be subject to termination . . . .

(original emphasis removed). Rule of Conduct #34 ("Rule 34"), referenced in the Injured Employee Information Letter, states that "Dishonesty of any kind in relations with the Company, such as . . . misrepresentation in obtaining employee benefits or privileges *will be grounds for dismissal . . . .*" (emphasis added).

On 7 September 2006, plaintiff's doctor completed a form indicating that plaintiff could return to work on 18 September 2006, subject to lifting restrictions to remain in effect through 21 September 2006. Plaintiff returned to work sometime after 21 September 2006 and reinjured herself.

After plaintiff reinjured her shoulder, her treating physicians prescribed that she not return to work until 1 November 2006. On 7 November 2006, plaintiff's doctor wrote a letter extending the time for plaintiff to remain out of work through 1 January 2007, with surgery scheduled for 13 December 2006 related to a disc herniation at the level of C5-6.

At the time plaintiff had sustained the original injury to her shoulder on 27 August 2006, she also was employed on a full-time basis in an administrative capacity at Duke University ("Duke"). Following

her injury, plaintiff advised Defendant's human resources department that she still was working at Duke. Defendant did not object to the fact that plaintiff continued to work at Duke because the work restrictions placed upon plaintiff in September 2006 were compatible with her administrative duties at Duke.

Plaintiff stopped working at her job at Duke at the time of her surgery in December 2006 but returned to work at that job at the end of January 2007. Plaintiff did not, however, return to work with Defendant or contact Defendant following her surgery. On or about 21 March 2007, Defendant received a letter from plaintiff's doctor stating that she was able to return to work with restrictions, including no bending, no twisting, and no lifting over five pounds. Then, on 5 April 2007, plaintiff's doctor followed up with another letter stating that plaintiff was unable to return to work until after an appointment scheduled for 14 June 2007.

After receiving two letters from plaintiff's doctor, which seemed to contradict each other, Defendant's manager for worker's compensation claims became suspicious of plaintiff's actions. On 12 April 2007, as part of an investigation, Defendant's worker's compensation manager called plaintiff's work number at Duke to determine whether plaintiff had returned to work there. When the worker's compensation manager called, plaintiff answered, "This is Lamez." The 12 April 2007 phone call established that plaintiff had returned to her job at Duke while continuing to receive worker's compensation benefits from Defendant based upon the representation contained in the letter from plaintiff's doctor dated 5 April 2007 that plaintiff was "advised . . . not to return to work until after her [14 June 2007] appointment[.]"

On 23 April 2007, Defendant terminated plaintiff's employment with Defendant based upon the ground that plaintiff had committed worker's compensation fraud in violation of Rule 34. Plaintiff did not avail herself of the grievance or arbitration procedures contained in the CBA, *see supra*; therefore, an Area Board was never constituted to review the merits of Defendant's decision to terminate plaintiff. Rather, on 19 September 2007, plaintiff filed a complaint with the Employment Discrimination Bureau of the North Carolina Department of Labor ("NCDOL"), alleging that Defendant had violated the North Carolina Retaliatory Employment Discrimination Act ("REDA") by terminating plaintiff's employment in retaliation for plaintiff's pursuit of a worker's compensation claim. By letter dated 14 January 2008, NCDOL determined that there was insufficient evidence to substantiate plaintiff's claim and notified plaintiff of the

WILLIAMS v. AM. EAGLE AIRLINES, INC.

[208 N.C. App. 250 (2010)]

time within which plaintiff was required to act should she decide to pursue the matter further.

On 11 April 2008, plaintiff filed suit against Defendant and asserted the following claims: (1) wrongful termination in violation of REDA; (2) wrongful discharge from employment in violation of North Carolina public policy; (3) breach of employee contract; (4) tortious interference with contract of employment; and (5) intentional infliction of emotional distress or alternatively, negligent infliction of emotional distress. On 18 April 2008, plaintiff amended her complaint, adding a sixth claim for "vicarious liability," related to the conduct of a manager for Defendant alleged to have acted as Defendant's agent in relation to the claims asserted by plaintiff. On 16 June 2008, Defendant filed an answer, denying the material allegations of plaintiff's complaint and asserting multiple affirmative defenses.

A jury trial commenced on 3 March 2009. On 9 March 2009, the trial court granted Defendant's motion for a directed verdict with respect to plaintiff's claims for wrongful discharge in violation of public policy, intentional infliction of emotional distress, and negligent infliction of emotional distress.

On 10 March 2009, the jury found in favor of plaintiff with respect to her claims for breach of the agreement and tortious interference with contract, awarding her damages in the amount of $232,000.00. However, the jury returned a verdict in favor of Defendant with respect to plaintiff's REDA claim. A judgment consistent with the jury's verdict was entered by the trial court on 14 September 2009.

[1] Following entry of judgment, Defendant filed a motion for JNOV, or in the alternative, for a new trial.[1] The trial court entered an order on 5 November 2009 denying both motions. On 18 November 2009, Defendant gave its notice of appeal, enumerating ten rulings by the trial court from which appeal is taken. On appeal, however, the arguments presented in Defendant's brief are limited to the trial court's denial of its motion for JNOV and, in the alternative, for new trial.

---

1. Defendant filed a motion for JNOV, or in the alternative, motion for a new trial after the jury rendered its verdict but prior to the entry of judgment. Plaintiff responded to the motion, and defendant filed a reply to plaintiff's response. A hearing was held on defendant's motion on or about 7 May 2009. An order was entered denying defendant's motion on 3 June 2009. Thereafter, the trial court entered judgment with respect to the jury's verdict. Believing that its prior motion for JNOV had been premature, defendant renewed its motion by the filing of a second motion for JNOV and alternative motion for new trial.

Accordingly, issues related to the trial court's rulings that are not specifically addressed in Defendant's brief or for which no reason or argument has been made, are deemed to be abandoned. *See* N.C. R. App. P. 28(b)(6) (2009).

[2] On appeal, Defendant argues that plaintiff's claims for breach of employee contract and for tortious interference with contract are preempted by the RLA and, therefore, the trial court lacked subject matter jurisdiction over those claims, thereby rendering the judgment entered on the jury's verdict a legal nullity. We agree.

"Whether a trial court has subject-matter jurisdiction is a question of law, which is reviewed de novo on appeal." *McKoy v. McKoy*, 202 N.C. App. 509, 511, 689 S.E.2d 590, 592 (2010). Subject matter jurisdiction properly is determined by "the state of affairs existing at the time it is invoked." *In re Peoples*, 296 N.C. 109, 144, 250 S.E.2d 890, 910 (1978) (citations omitted), *cert. denied*, 442 U.S. 929, 61 L. Ed. 2d 297 (1979). It is a time-honored principle that "proceedings of a court without jurisdiction over the subject matter are a nullity and its judgment [is] without effect either on the person or property." *Hart v. Motors.*, 244 N.C. 84, 90, 92 S.E.2d 673, 678 (1956) (citations omitted).

The United States Supreme Court has held that, when an employee's claim is "firmly rooted in a breach of [a collective bargaining agreement]" and asserts no rights independent of that agreement, such claim is preempted by the RLA. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 257-58, 129 L. Ed. 2d 203, 214 (1994). *See also Andrews v. Louisville & Nashville R. Co.*, 406 U.S. 320, 323, 32 L. Ed. 2d 95, 99 (1972) (noting a prior Supreme Court decision that held, "before a state court action could be maintained for breach of such a contract, the employee must first '*attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress.'") (quoting *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652, 13 L. Ed. 2d 580, 583 (1965) (emphasis in original)). In the case *sub judice*, the third claim for relief set forth in plaintiff's complaint, entitled "BREACH OF EMPLOYEE CONTRACT," is firmly rooted in, and asserts no rights independent of the CBA and, therefore, is preempted by the RLA. *Hawaiian Airlines*, 512 U.S. at 257-58, 129 L. Ed. 2d at 214.

## WILLIAMS v. AM. EAGLE AIRLINES, INC.

[208 N.C. App. 250 (2010)]

The claim for breach of the employee contract pleaded in plaintiff's complaint alleges that, "by terminating Plaintiff from her position without *just cause,* . . . Defendant breached its contract with the Union and the Plaintiff." (Original underline replaced with italics). As is evidenced on the face of the complaint, the basis of plaintiff's claim for breach is Defendant's alleged lack of just cause to terminate plaintiff's employment. An obligation of just cause as a condition precedent to the termination of employment could arise only out of the CBA. *See Bowen v. United States Postal Service,* 459 U.S. 212, 220, 74 L. Ed. 2d 402, 411 (1983) (recognizing that "a collective-bargaining agreement is much more than traditional common-law employment terminable at will. Rather, it is an agreement creating relationships and interests under the federal common law of labor policy."). Therefore, it is axiomatic that plaintiff's claim for breach of employment contract, premised upon a lack of just cause, is firmly rooted in and asserts no rights independent of the CBA, and the claim is preempted by the RLA. *Hawaiian Airlines,* 512 U.S. at 257-58, 129 L. Ed. 2d at 214.

Plaintiff argues that her claim for breach of employee contract is not premised solely upon the CBA. According to plaintiff, Rule 34 created additional contractual obligations between Defendant and plaintiff that were violated upon Defendant's termination of plaintiff's employment. However, during oral argument counsel for plaintiff conceded that the agreement at issue with respect to the claim of breach was the CBA. The apparent contradiction in plaintiff's argument notwithstanding, plaintiff's argument that Rule 34 created contractual obligations between plaintiff and Defendant lacks merit for two reasons. First, it is a well-established principle of federal labor law that individual employees within a bargaining unit may not negotiate their own employment contract with their employer. *See, e.g., J. I. Case Co. v. National Lab. Rel. Bd.,* 321 U.S. 332, 337-39, 88 L. Ed. 762, 767-69 (1944). Second, the CBA, by its terms, explicitly recognizes the Union as the *sole* bargaining agent for all Fleet Service employees employed by Defendant, with the *exclusive* power to negotiate and conclude an agreement with Defendant "with respect to rates of pay, *rules* and working conditions for all employees covered under this agreement . . . ." (emphasis added). Therefore, in view of established legal precedent as well as the express language of the CBA itself, Rule 34 could not create any *contractual* rights or obligations between plaintiff and Defendant.

Because plaintiff's breach of contract claim was preempted by the RLA, and because "the jurisdiction of a court depends upon the state of affairs existing at the time it is invoked," *In re Peoples*, 296 N.C. at 144, 250 S.E.2d at 910, the trial court lacked subject matter jurisdiction over plaintiff's claim for breach of the CBA and the judgment on this claim cannot stand. As our State Supreme Court has said, "proceedings of a court without jurisdiction over the subject matter are a nullity and its judgment [is] without effect either on the person or property." *Hart*, 244 N.C. at 90, 92 S.E.2d at 678.

Similarly, plaintiff's claim for tortious interference with contract of employment also is preempted.

> To establish a claim for tortious interference with contract, a plaintiff must show: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the Defendant knows of the contract; (3) the Defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Gupton v. Son-Lan Development Co., Inc.*, 205 N.C. App. 133, 142, 695 S.E.2d 763, 770 (2010) (quoting *Sellers v. Morton*, 191 N.C. App. 78, 81, 661 S.E.2d 915, 921 (2008)). As noted *supra*, individual employees subject to a CBA may not negotiate their own employment contracts with their employers. *See J. I. Case* Co., 321 U.S. at 337-39, 88 L. Ed. at 767-69. Accordingly, the only contract upon which this claim could be based is the CBA. Plaintiff's counsel conceded this point during oral argument. As we also discussed *supra*, employee claims that are firmly rooted in and assert no rights independent of a CBA are preempted by the RLA. *Hawaiian Airlines*, 512 U.S. at 257-58, 129 L. Ed. 2d at 214. Because plaintiff's tortious interference with contract claim was preempted by the RLA, and because "the jurisdiction of a court depends upon the state of affairs existing at the time it is invoked," *In re Peoples*, 296 N.C. at 144, 250 S.E.2d at 910, the trial court lacked subject matter jurisdiction over plaintiff's claim for tortious interference with contract, and the judgment on this claim cannot stand.

For the reasons discussed herein, we vacate the judgment entered by the trial court on 14 September 2009 and remand.

Vacated and Remanded.

Judges ELMORE and STEPHENS concur.