# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 10-2813/2973

_____

Caleb R. Sturge,                                  *
                                                  *
    Appellant/Cross-Appellee,            *
                                                  *  Appeals from the United States
v.                                                *  District Court for the
                                                  *  District of Minnesota.
Northwest Airlines, Inc.,                         *
                                                  *
    Appellee/Cross-Appellant.            *

_____

Submitted:  June 17, 2011
Filed:  October 7, 2011

_____

Before COLLOTON and BENTON, Circuit Judges, and KOPF,[1] District Judge.

_____

COLLOTON, Circuit Judge.

Caleb Sturge was terminated for cause from his employment with Northwest Airlines, Inc., shortly after he was arrested for possession of marijuana. At the same time, Sturge had pending with Northwest a request for disability retirement benefits. Northwest later granted Sturge's request, but he was ineligible for certain retirement benefits as a result of the termination. Sturge sued Northwest, claiming that the termination violated section 510 of the Employee Retirement Income Security Act

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, sitting by designation.

("ERISA"), 29 U.S.C. § 1140. The district court[2] denied Northwest's motion to dismiss for lack of subject-matter jurisdiction, but granted its motion for summary judgment. Both parties appeal, and we affirm.

I.

Sturge began working for Northwest on February 17, 1989.[3] At the time of his termination, he was employed as first officer on Boeing 747 aircraft. His employment with Northwest was subject to a collective bargaining agreement ("CBA") negotiated by the Air Line Pilots Association, the exclusive bargaining representative of Northwest pilots.

On July 17, 2003, Sturge was placed on long-term medical leave as a result of injuries he suffered outside of work. On October 8, 2003, Sturge applied for disability retirement benefits. Disability retirement benefits are available pursuant to the Northwest Airlines Pension Plan for Pilot Employees ("Pension Plan"). A pilot on disability retirement is entitled to pension income based on the amount of the pilot's salary. Such a pilot ordinarily is entitled to several other benefits, pursuant to the CBA: continued accrual of seniority; a right to return to work if the disability ceases; pass privileges (discounted rates on Northwest flights) for the pilot and qualifying members of his family; and company-paid medical insurance for the pilot and qualifying members of his family, if the pilot worked for Northwest for at least 15 years before electing disability retirement. Sturge would have attained 15 years of employment in January 2004 if he had not been terminated.

---

[2]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

[3]Northwest no longer exists as a corporate entity, having merged into Delta Airlines, Inc., effective December 31, 2009. The events at issue occurred before the merger.

On October 17, 2003, Sturge was arrested for possession of marijuana. Northwest pilots are subject to a drug policy that prohibits the possession of controlled substances, so after law enforcement officials informed Northwest of the arrest, the company began an investigation. During the investigation, Sturge admitted to possessing and using marijuana. Northwest then terminated Sturge's employment on October 31, 2003. Sturge grieved the termination, and it was upheld by a system board of adjustment on October 5, 2004.

Despite the termination, Northwest continued to process Sturge's application for disability retirement. Northwest approved the application on November 22, 2004, and determined that Sturge's "retirement date" was October 31, 2003 – the date of his termination. But as a result of his termination for cause, Sturge was not eligible for some of the benefits ordinarily available to pilots on disability retirement, namely, accrual of seniority, the right to return to work, or pass privileges. So too, because Sturge was terminated before he had attained 15 years of employment with Northwest, he was not eligible for company-paid medical insurance premiums. Sturge also claims that because his disability retirement pension income is based on his salary prior to taking disability retirement, and because pilots typically receive an increase in salary upon reaching 15 years of employment, his pension income is lower than it would have been without the termination.

Sturge sued Northwest in August 2005, alleging that the company terminated him in violation of section 510 of ERISA. The case was administratively terminated in September 2005, due to Northwest's then-pending bankruptcy proceedings. When the case was reopened in May 2008, Northwest moved to dismiss for lack of subject-matter jurisdiction. The district court denied that motion, but later granted Northwest's motion for summary judgment.

Sturge appeals the grant of summary judgment. Northwest cross-appeals the denial of its motion to dismiss for lack of subject-matter jurisdiction.

-3-

II.

A.

We first address Northwest's appeal of the district court's order denying the motion to dismiss, because it implicates our subject-matter jurisdiction. The Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-188, governs labor relations in the airline industry. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994). It "establishes a mandatory arbitral mechanism for the prompt and orderly settlement of two classes of disputes" between air carriers and their employees: major disputes and minor disputes. *Id.* at 252 (internal quotations omitted); *see* 45 U.S.C. § 151a.

"'Major' disputes involve 'the formation of collective bargaining agreements or efforts to secure them.'" *Taggart v. Trans World Airlines, Inc.*, 40 F.3d 269, 272 (8th Cir. 1994) (quoting *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302 (1989)). Parties to a major dispute are required to pursue "a lengthy process of bargaining and mediation." *Consol. Rail. Corp.*, 491 U.S. at 302. Minor disputes are "controversies arising out of the application or interpretation of [a] collective bargaining agreement." *Gore v. Trans World Airlines*, 210 F.3d 944, 949 (8th Cir. 2000). Minor disputes "must be resolved only through the RLA mechanisms, including the carrier's internal dispute-resolution processes and an adjustment board established by the employer and the unions." *Hawaiian Airlines*, 512 U.S. at 253; *see* 45 U.S.C. § 184. The adjustment board has "mandatory, exclusive, and comprehensive jurisdiction over minor disputes," *Hastings v. Wilson*, 516 F.3d 1055, 1059 (8th Cir. 2008) (internal quotation omitted), and state and federal courts lack subject-matter jurisdiction over claims based on minor disputes. *Deneen v. Nw. Airlines, Inc.*, 132 F.3d 431, 439 (8th Cir. 1998). The RLA does not, however,

-4-

deprive courts of jurisdiction over disputes that do not fall within either category. *Cf. Hawaiian Airlines*, 512 U.S. at 266.[4]

Northwest contends that Sturge's claims are based on minor disputes, and that the district court therefore lacked subject-matter jurisdiction. A dispute between an air carrier and an employee is a minor dispute if its resolution "depends on an interpretation of [a] CBA." *Hawaiian Airlines*, 512 U.S. at 261. As such, "[c]ourts can resolve questions of federal or state law involving labor claims only if the issues do not require the court to construe the collective bargaining agreement." *Deneen*, 132 F.3d at 439. Courts may, however, resolve issues that require mere reference to a collective bargaining agreement. *Hawaiian Airlines*, 512 U.S. at 261 n.8; *Thomas v. Union Pac. R.R. Co.*, 308 F.3d 891, 893 (8th Cir. 2002). Likewise, the RLA does not deprive courts of jurisdiction to decide "'purely factual questions' about an employee's conduct or an employer's conduct and motives" that "do not 'requir[e] a court to interpret any term of a collective-bargaining agreement.'" *Hawaiian Airlines*, 512 U.S. at 261 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988)) (alteration in original).

---

[4]State-law claims subject to the RLA's arbitration requirement are "pre-empted" by the RLA, while claims based on federal law are "precluded." *See Hawaiian Airlines*, 512 U.S. at 259 n.6. But questions of preemption and preclusion involve the same inquiry: whether the claim is based on a minor dispute. *See Hastings*, 516 F.3d at 1059 (holding that ERISA claims are precluded if they are minor disputes); *Taggart*, 40 F.3d at 272 ("The RLA . . . pre-empts state law claims that involve minor disputes because such disputes are subject to mandatory arbitration."); *see also Hawaiian Airlines*, 512 U.S. at 259 n.6 ("[*Atchison, Topeka & Santa Fe Ry. Co. v.*] *Buell*, of course, involved possible RLA preclusion of a cause of action arising out of a *federal* statute, while this case involves RLA pre-emption of a cause of action arising out of *state* law . . . . That distinction does not rob *Buell* of its force in this context."). We thus look to both preclusion and preemption cases for guidance in determining whether Sturge's claims are based on minor disputes.

In light of these principles, we have held that an ERISA claim may be a minor dispute, subject to the RLA's arbitration requirement, if the pension plan on which the claim is based "is (1) itself a collective bargaining agreement or (2) maintained pursuant to a collective bargaining agreement." *Hastings*, 516 F.3d at 1059. But even if the relevant plan is created or maintained pursuant to a collective bargaining agreement, "[t]he district court, rather than the RLA arbitration board, has jurisdiction over ERISA claims that are independent of an interpretation or application of any collective bargaining agreements." *Id.*

According to Northwest, the benefits that are the subjects of Sturge's claims are available to eligible retirees pursuant to the Pension Plan, which Northwest describes as a collectively bargained agreement, or pursuant to the CBA itself. Northwest argues that a court will have to interpret those agreements to resolve three issues raised by Sturge's claims: (1) whether Sturge is eligible for the benefits at issue in this case, despite his for-cause termination; (2) whether Sturge is eligible for the benefits despite his use of illegal drugs; and (3) whether certain comparator evidence offered by Sturge to support his claim that Northwest acted with improper motivation is entitled to any weight.

Northwest's contention regarding the first issue – whether Sturge's termination affects his eligibility for the benefits at issue in this case – cannot succeed in light of Sturge's claims. Sturge concedes that a terminated pilot is not entitled to the benefits. He also concedes that his termination for a violation of Northwest's drug policy was proper under the CBA. Sturge argues only that Northwest acted with an improper purpose: to retaliate against him for claiming ERISA-protected benefits, or to interfere with his receipt of those benefits. The questions whether Sturge is entitled to benefits despite his termination, and whether the termination was proper under the CBA, are therefore irrelevant to the resolution of Sturge's claims. Similarly, a judgment in Sturge's favor will not undermine the decision of the system adjustment board, which held only that the termination was authorized under the CBA.

-6-

Accordingly, Sturge's claim on this point requires not an interpretation of a collectively bargained agreement, but a resolution of a "'purely factual question[]' about . . . an employer's conduct and motives." *Hawaiian Airlines*, 512 U.S. at 261 (quoting *Lingle*, 486 U.S. at 407); *cf. Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1415 (8th Cir. 1997) (holding that the RLA precluded an ADEA claim that involved a dispute over the meaning of a CBA provision governing the location at which employees may exercise seniority rights).

Northwest's argument regarding the second issue – whether Sturge is eligible for the benefits despite his use of illegal drugs – also fails. Northwest asserts that "[t]he effect of a drug policy violation on Sturge's eligibility for the benefits he complains about losing cannot be assessed without interpreting and applying the CBA," including the CBA's provisions regarding fitness for duty, and the rules of conduct regarding drug use. But as the district court recognized, Northwest does not dispute that Sturge would have been entitled to the benefits he seeks if he had not been terminated. There is thus no need to interpret these provisions.

Northwest's contention regarding the third issue – the weight to be given comparator evidence in evaluating his ERISA claim – implicates the difference between interpreting a collective bargaining agreement and merely referring to one. Interpretation of a provision of a collective bargaining agreement entails the resolution of a dispute about the meaning of the provision. *See Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349-50 (5th Cir. 2008). But where the meaning of a provision in the CBA is not disputed, the application of that provision to a set of facts involves only reference to the provision. *See id.*; *see also Hawaiian Airlines*, 512 U.S. at 261 n.8 ("'[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.'") (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994)).

In support of his ERISA claim, Sturge intends to offer evidence regarding a comparator pilot, William Brewbaker. Sturge contends that Brewbaker was similarly situated to him in all relevant respects, except that Brewbaker did not apply for disability retirement. Northwest argues that a court cannot assess whether Brewbaker was similarly situated to Sturge without interpreting the provisions of the CBA and the Pension Plan governing seniority, rank, eligibility for exceptions to the drug policy's discharge requirement, and determination of the severity of a violation of the drug policy. Yet Sturge does not dispute the meaning of any of these provisions, and Northwest does not argue that any of these provisions is the basis of a relevant distinction between Sturge and Brewbaker. Sturge claims only that the comparator evidence supports his claim that Northwest treated differently than a similarly situated pilot because of his application of disability retirement benefits. As such, Sturge's proposed comparator evidence requires at most mere reference to a collectively bargained agreement. *See Hawaiian Airlines*, 512 U.S. at 261 n.8; *Carmona*, 536 F.3d at 349-50.

Northwest contends finally that its decision to terminate Sturge was "arguably justified" by the CBA. It cites the Supreme Court's decision in *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299 (1989), for the proposition that actions arguably justified by a CBA present minor disputes. The Court later made clear, however, that "[t]his 'arguably justified' standard . . . was employed only for policing the line between major and minor disputes," and "said nothing about the threshold question whether the dispute was subject to the RLA in the first place." *Hawaiian Airlines*, 512 U.S. at 265-66.

For these reasons, we conclude that the district court properly exercised jurisdiction over the case.

B.

We turn to Sturge's appeal of the district court's grant of summary judgment. We review a grant of summary judgment *de novo*, viewing the evidence in the light most favorable to Sturge, the nonmoving party. *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011). A party is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact," and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Sturge contends that his termination violated section 510 of ERISA, 29 U.S.C. § 1140. Under section 510, an employer may not discharge a participant in an employee benefit plan (1) in retaliation "for exercising any right to which he is entitled under the provisions of an employee benefit plan," or (2) "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." Sturge asserts a claim under each prong of the statute.

Only one element is in dispute with regard to each of Sturge's claims, namely, whether Sturge has shown a causal connection between his termination and his application for disability retirement benefits. To prevail under the retaliation prong of the statute, Sturge must show a causal connection between his termination and his application for ERISA-protected benefits. *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1043 (8th Cir. 2010). To prevail under the interference prong, Sturge must show a causal connection between the termination and the likelihood, at the time he was fired, that he would receive disability retirement benefits in the future. *Id.* at 1043-44. Sturge relies on the same evidence and argument to prove each element. We therefore consider them together.

Sturge claims that Northwest terminated him in retaliation for his application for disability retirement, and to interfere with his receipt of the benefits to which a pilot on disability retirement is ordinarily entitled. Northwest counters that it

terminated Sturge because he violated Northwest's drug policy, which is a firing offense unless certain exceptions apply. The district court, considering Sturge's claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), held that Sturge neither made a *prima facie* showing that Northwest had violated section 510, nor rebutted Northwest's claim that it fired him because of his drug use. Because the record was fully developed in connection with Northwest's motion for summary judgment, we address directly whether Sturge has presented sufficient evidence for a reasonable jury to conclude that Northwest terminated him because of his request for disability benefits. *See Fanning v. Potter*, 614 F.3d 845, 850 (8th Cir. 2010).

Sturge first asserts that a jury could infer, based on the testimony of Robert Brodin before the system adjustment board, that Sturge's eligibility for ERISA-protected benefits was a motivating factor the decision to terminate him. Brodin was senior vice-president of the Labor Relations – Flight Department at the time of Sturge's termination, and it was he who decided to terminate Sturge. According to Sturge, Brodin admitted that in deciding to fire Sturge, he considered Sturge's medical condition, the fact that he was on long-term medical leave, and the likelihood that he would never fly again.

Brodin made the purported admission while explaining why he concluded, prior to terminating Sturge, that Sturge was ineligible for the Northwest Airlines Pilot Assistance Program. Under this program, a pilot who violates Northwest's drug policy is allowed to keep his job if he qualifies as a "pre-duty violator." A pre-duty violator is "an employee who violates [Northwest's] alcohol or drug rules and is reported to [Northwest's] management, including self-reporting, prior to the duty threshold for the applicable employee group, and does not thereafter perform any duties." The "duty threshold" for a pilot is "the commencement of the final items of the start check, or . . . commencement of the before start checklist, whichever is appropriate to the given aircraft."

Brodin testified on direct examination before the board of adjustment that Sturge did not qualify as a pre-duty violator because, among other reasons, he "was not . . . in a pre-duty circumstance," since "[h]e was on a long-term sick leave with no . . . possibility of assignment to any kind of flight duty in the near future." On cross-examination, Brodin reaffirmed that one of the reasons for his conclusion was that Sturge "was not truly pre-duty because he was on long-term medical leave."

We do not believe this testimony supports a reasonable inference that Brodin had an unlawful motive for terminating Sturge. This evidence, viewed in the light most favorable to Sturge, shows only that Brodin considered Sturge's long-term medical leave to determine whether he was eligible for enrollment in the pilot assistance program. Brodin concluded that Sturge did not qualify, and the board of adjustment agreed. Sturge does not suggest that Brodin's consideration of this question was inappropriate, and we do not see how it supports a finding of impermissible motive in the termination decision.

Sturge next contends that Northwest's conduct in processing his application for disability retirement supports an inference that the company terminated him in retaliation for, or to interfere with, the application. According to Sturge, Northwest instructed him to attend an independent medical evaluation ("IME"), but did not provide the examining physician with certain of his medical records. Sturge also claims that Northwest "lied" to the examining physician, telling him that no neurologist or orthopedist had declared him unfit to fly when the company knew otherwise. He further alleges that Northwest's questions to the examining physician suggested falsely that his work as a first officer involved only "light" labor.

These facts do not support Sturge's ERISA claim, because they relate to events that occurred ten months after his termination, and there is no evidence connecting the decisionmaker on Sturge's termination to the processing of Sturge's application for disability retirement. Brodin testified that he does not sign such applications, and the

-11-

documentary evidence shows that the applications are processed by a separate department.

Sturge also argues that his proposed comparator evidence creates a genuine issue of fact for trial. The comparator pilot – William Brewbaker – was fired in 1990 after a drug test detected cocaine in his system. In 1993, he was reinstated pursuant to a "last-chance agreement" negotiated by the union. Two years later, while still subject to the last-chance agreement, Brewbaker tested positive for marijuana after a mishap while operating an Northwest aircraft. While the company's investigation of drug use was ongoing, Brewbaker wrote a letter to Northwest stating that, "effective immediately," he elected to take early retirement.

Sturge contends that although Brewbaker committed a more serious infraction, the company treated him more favorably than Sturge. In particular, Sturge asserts that Brewbaker was given a choice to resign or be terminated – a choice that Sturge claims he was not given. Sturge points to a "Personnel Action Notice" form that states that Brewbaker "resigned in lieu of discharge." Sturge also notes that Brodin, who had no independent recollection of the circumstances, agreed during his deposition that the form suggests that Brewbaker was given a choice to resign.

We conclude that Brewbaker was not similarly situated to Sturge in all relevant respects, *see Koons v. Aventis Phramaceuticals, Inc.*, 367 F.3d 768, 779 (8th Cir. 2004), and the purported differential treatment does not support a reasonable inference that Northwest terminated Sturge because of his application for disability retirement benefits. Brewbaker elected to take early retirement seven days after Northwest began investigating his conduct, while the investigation was still in progress. Shortly thereafter, Northwest acknowledged Brewbaker's "unconditional Letter of Resignation" and informed Brewbaker that "but for [his] unconditional resignation," he "would have been discharged from employment." Sturge presented no evidence that Northwest would not have allowed him to follow the same course. Sturge did not

submit an unconditional resignation and proposal for early retirement during Northwest's investigation of his drug possession. He waited until the investigation was completed, suffered termination, and grieved that action unsuccessfully.

Sturge also argues that Northwest acted as though Brewbaker's choice to elect early retirement deprived the company of authority to terminate him for cause, but did not treat Sturge's application for disability retirement in the same way. The undisputed evidence shows, however, that early retirement is materially different than disability retirement. Disability retirement involves a long approval process during which the applicant remains an employee. A pilot who is granted disability retirement ordinarily continues to accrue seniority and to retain eligibility for reinstatement if his disability is remedied. There is no evidence that pilots electing early retirement enjoy such benefits. Sturge's application for disability retirement was not an unconditional resignation, effective immediately, as was Brewbaker's election to take early retirement. We therefore conclude that the two applicants were not similarly situated in all relevant respects.

Finally, Sturge contends that a jury reasonably could find that Brodin, the decisionmaker, was not credible when he denied knowing of Sturge's pending disability retirement application, and that this alleged lack of credibility and the short time span between Brodin's awareness of Sturge's application and the termination shows an impermissible motive. We agree with the district court, however, that Sturge's arrest and violation of Northwest's drug policy was an independent cause for the termination. *See Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 698 (8th Cir. 2006); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). Company policy provides that Sturge's conduct was "grounds for immediate discharge," and the system board upheld the company's position that he was not eligible for an exception. That Brodin also may have learned around the same time that Sturge had a pending application for disability retirement is not a sufficient basis to infer that the

termination was caused by anything other than a clear violation of the company's drug policy that called for immediate discharge.

*     *     *

The judgment of the district court is affirmed.

_____